

FILED

2016 Mar-07  PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| **KRISTIN HURT, et al.,** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:13-cv-00230-VEH** |
| | ) | |
| **SHELBY COUNTY BOARD OF** | ) | **JURY DEMAND** |
| **EDUCATION, et al.,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jon C. Goldfarb
Daniel E. Arciniegas
Rachel L. McGinley
L. William Smith
Attorneys for Plaintiffs

**OF COUNSEL:**
**WIGGINS, CHILDS, PANTAZIS, FISHER,**
**& GOLDFARB, LLC.**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

# **TABLE OF CONTENTS**

**PAGES:**

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Response to the School Board's Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  Plaintiffs' Statement of Additional Facts  . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Acker Has Pleaded Guilty to Sexually Abusing Each of the Jane Does
       In This Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  Acker Sexually Abused Kristin Hurt During the School Day  . . . . . . 4

    C.  Acker Sexually Abused Hurt at Her Home  . . . . . . . . . . . . . . . . . . . 6

    D.  Hurt's Mother Reports the Abuse to DHR, which Investigates, and,
       After a Contested Hearing, Issues a Finding of "Reason to Suspect"
       Child Abuse Requiring an Entry in the Central Registry . . . . . . . . . . 7

    E.  After Receiving the DHR Decision of Hearing Officer Loper,
       Superintendent Rogers Suspends Acker With Pay  . . . . . . . . . . . . . 9

    F.  Acker and His Friends Begin a Campaign to Discredit Hurt . . . . . . 10

    G.  The School Board Conducts a Hearing Regarding Whether to Accept
       Superintendent Rogers' Recommendation to Terminate Acker  . . . 12

    H.  The School Board Members Now Claim that Superintendent Rogers
       Failed to Provide Loper's Decision, and that the Final DHR Decision
       Would Have Caused Them to Terminate Acker in 1993 . . . . . . . . . 15

    I.  The School Board Either Was Deliberately Indifferent to DHR's
       Findings of Abuse in the DHR Report, or Superintendent Rogers Was
       Deliberately Indifferent in Failing to Provide the Board with the DHR
       Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    J.  The Board Disregarded Testimony from Hurt and Her Psychiatrist

and Allowed Acker to Present Evidence of the Child's Alleged Sexual History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

K.   The School Board Returned Acker to the Classroom Despite DHR's Finding of Abuse, Allowing Him to Continue Abusing Children for the Next Twenty Years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

L.   The School Board and Superintendent Failed to Monitor Acker and Failed to Protect Hurt from Retaliation for Reporting Abuse . . . . . 22

M.   Hurt Has Suffered Long-Term, Continuing Damages as a Result of the Abuse and the School Board's Failure to Take Remedial Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

N.   Jane Doe #6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

O.   Jane Doe #5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

P.   Jane Doe #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Q.   Jane Doe #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

R.   Jane Doe #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

S.   Jane Doe #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV.   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

A.   Equitable Tolling Renders Hurt's Claims Timely . . . . . . . . . . . . . 36

B.   A Reasonable Jury Could Find that the Board and Norma Rogers Had Actual Notice of Acker's Abuse of Female Students and Acted with Reckless Disregard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

C.   Plaintiffs' Section 1983 Claims Should Proceed to Trial . . . . . . . . 45

D.   Doebler and Martin Are not Entitled to Qualified Immunity . . . . . . 46

E.   Plaintiffs' State Law Claims Against Doebler and Martin in their

Individual Capacities Should Proceed . . . . . . . . . . . . . . . . . . . . . . . 48

V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## I.    Introduction

"To all of you who put Danny Acker back amongst the children, may God have mercy upon your soul when his next victim comes forward." A concerned community member, Mrs. Carpenter, wrote these words to Shelby County School Board President Lee Doebler in 1993 in her letter protesting the Board's decision to return Daniel Acker, a fourth grade teacher and confirmed child molester, to the classroom.

Facing individual liability in this lawsuit for their decision to release Acker back into the classroom where he returned to molesting young girls, School Board President Doebler and School Board member Steve Martin now blame Superintendent Norma Rogers for their decision to allow Acker to continue preying on vulnerable children for the next twenty years.  Martin and Doebler call Rogers an incompetent superintendent who had the full report that Alabama Department of Human Resources had prepared on Acker but failed, incomprehensibly, to provide it to the Board.

In that report, DHR had found that Kristin Hurt, one of Acker's female students, "was sexually abused and that abuse was perpetrated by Danny Acker at the Lopez's residence on August 6, 1991," and that "Danny Acker intentionally touched Kristin's breast, an intimate part of her body, by placing his hand under her shirt and then under her bra." Steve Martin testified that if he had seen the DHR report in 1993 containing these factual findings, he would have voted to terminate Acker's employment at that time. Doebler, for his part, testified that it is "very possible" that

1

the Board would have made a different decision had it seen the complete DHR report.

In fact, as Superintendent Rogers testified, Martin, Doebler, and the rest of the board had the full DHR report in 1993 because she gave it to them. Rogers held nothing back from the Board and provided each member with a copy of the full DHR report. Indeed, Doebler wrote back to Ms. Carpenter, "Let me assure you that I have a personal relationship with Jesus Christ and I have absolutely no concern for the safety of my soul . . . My colleagues and I read the DHR report."

A reasonable jury could conclude that Doebler and Martin now are lying to evade responsibility for their deliberate indifference to the likelihood that Acker, once returned to the classroom, would continue to sexually abuse the children whom the School Board entrusted to him. Alternatively, Superintendent Rogers is lying about providing the Board with the full report, meaning that she was deliberately indifferent. Only a jury can resolve this swearing match between the Board and the Superintendent and determine who was at fault. (Either way, the School Board will be liable under Title IX). Accordingly, summary judgment should be denied.

## II.   Response to the School Board's Facts

2.     Disputed as to the welcomeness of Acker's conduct. Kristin testified that at first, "I didn't think anything of it. I just thought it was something that was okay." (Doc. 71-1, 35:5-13). Hurt testified, however, that "I tried everything to do – not to go next to him." (Doc. 71-1, 141:19-21).

2

3.     Disputed as to Rogers only learning of the abuse in 1992, as Ms. Lopez also reported Acker's abuse of Kristin to Shelby County Superintendent of Schools Norma Rogers in the fall of 1991. (Doc. 71-3,11:15-13:23).

12.    Disputed, as Doebler had political connections with Acker's father, a County Commissioner and school principal. (Doc. 71-4,29:15-21; 30:19-31:6; 183:19-184:7).

44.    The previous superintendent, Norma Rogers, was aware of Acker's abuse of Kristin Hurt, as were the Board Members, including Lee Doebler and Steve Martin, who were also Board Members at the time of Acker's arrest.

## III.   Plaintiffs' Statement of Additional Facts.

### A.   Acker Has Pleaded Guilty to Sexually Abusing Each of the Jane Does In this Action.

1.     Daniel Acker began his teaching career with Shelby County in 1985 teaching Fourth Grade at Thompson Elementary, which then became Thompson Intermediate, and later taught at Creekview, retiring after the 2009 school year with 25 years of teaching credit. (Doc. 71-19,16:21-23:7; EX A, Confession Tr. 13:15-14:6).

2.     Acker has pleaded guilty to sexually abusing Kristin Hurt, Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, Jane Doe #5, and Jane #6, the plaintiffs in this action. Each of these individuals was a student in one of his fourth grade classrooms or as a passenger on Acker's school bus route. (Doc. 71-19, 13:15-20).

3.     Because of his crimes against these children, Mr. Acker is now serving a

seventeen-year-sentence at the Bullock County Correctional Facility in Union Springs, Alabama. (Doc. 71-19, 9:19-10:2; 12:17-13:14).

4.      Acker never touched boys for sexual gratification–only girls. (Doc. 71-19, 126:3-17; EX A, 37:22-38:2).

5.      Acker agreed that being a teacher is what gave him the opportunity to molest these children, and that he would not have had an opportunity to go on molesting students had the School Board not returned him to the classroom after Kristin Hurt's allegations in the early nineties. (Doc. 71-19, 313:13-15; 319:7-15).

6.      Lee Doebler served on the school board from 1998 through 2012, and was the President of the Board from 1992-2012. (Doc. 71-4,19:16-18). Steve Martin served on the school board from 1988 until July, 2014. (Doc. 71-6, 18:20-19:2).

**B.      Acker Sexually Abused Kristin Hurt During the School Day.**

7.      Kristin Hurt, formerly Kristin Lopez, was born in March, 1980. (Hurt 8:9-17). Kristin attended Thompson Elementary School in Shelby County from first through fifth grades and was sexually abused by her fourth grade reading and science teacher, Danny Acker, during and following the 1989-90 school year, between the ages of nine and ten. (Doc. 71-1, 33:17-35:13; Doc. 71-2,18:10-15).

8.      Acker rubbed Kristin's buttocks on numerous occasions in class, typically when she came to his desk for help with reading, or asking her to stand up and rubbing her rear end when he stood at her desk. (Doc. 71-1, 28:4-17;  34:13-35:4;

4

40:1-7).

9.     When Kristin was leaving his classroom, Acker "would put his -- one hand on my shoulder and then the other hand on my butt and rub it for a lengthier period of time, and sometimes would a little bit lift up my shirt and rub the lower -- where my pants line was." (Doc. 71-1,40:8-17).

10.     Kristin testified that, at first, "I didn't think anything of it. I just thought it was something that was okay." (Doc. 71-1, 35:5-13). Hurt testified, however, that eventually "I tried everything to do – not to go next to him." (Doc. 71-1, 141:19-21).

11.     Kristin told her mother, Linda Lopez, about Acker touching her bottom, but Lopez did not report this to anyone at this time. (Doc. 71-2, 19:9-17; 21:23-22:8).

12.     When Kristin was a student in Acker's fourth grade class, some boys were trying to look up her skirt, and she reported this to Acker, who told her that "maybe they think there will be a test question about the color of your underwear." (Doc, 71-1 at p. 59; Doc. 71-1, 45:14-17). The next day, Kristin's test had a question on it stating, 'What color is Kristin's underwear?'" (EX B, PX 3 at 00487; Doc. 71-19, 205:6-18).

13.     Acker sent a note home to Kristin's mother stating "I thought the last question might need some explanation. Kristin came to me complaining about some boys trying to look up her dress while we were studying. I kidded her saying the boys must think I was going to have a question about her underwear since that was the only

thing they were studying. I promise I'm not a pervert, I just have a strange sense of humor. I assure you this question was only on her copy of the test." (Lopez Dep. Ex. 1, Doc. 79-2 at p. 42; Doc. 79-2, 23:11-17; 26:21-28:5; Doc. 71-1, 36:12-37:8). Again, Kristin's mother did not report this to the school. (Doc. 71-2, 27:19-28:11).

14.    Kristin testified, "After I finished the test, I passed it in to him and I wouldn't even look at him, I was so embarrassed. I just wanted out of the classroom at that point in time." (Doc. 79-1, 46:10-13).

## C.    Acker Sexually Abused Hurt at Her Home.

15.    During the summer after Kristin's fifth grade year, Acker and his family moved to a house on the same street where Kristin and her mother lived. (Doc. 71-1,50:19-52:10; Doc. 71-1 at p. 59; Doc. 71-2, 30:21-31:11).

16.    The DHR Hearing Officer, Lamar Loper, later found that Acker "had an extraordinary preoccupation with Kristin Lopez ... Mr. Acker's move to Eddings lane and his daily visits to the Lopez home raise a suspicion of inordinate fixation. When one views the total events of 1990-1991, the move to Eddings Lane cannot be construed as a coincidence..." (EX C, PX 21 at 0116).

17.    On August 6, 1991, Acker came over to Kristin's house while her mother was gone. Kristin's brother was in the bedroom playing Nintendo. Acker and Kristin were sitting on the couch watching TV, and "[w]hile on the Mr. Acker put his right hand under my shirt, under my bra then moved his hand around to rub my right breast. As

Mr. Acker rubbed my breast I froze, I didn't know what to do, I just sat there." (Doc. 71-1 at p. 59; Doc. 71-1, 52:11-16; Doc. 71-2, 34:9-18; Doc. 71-19, 76:9-12; Confession Tr. 25:10-26:16; 28:2-4). Acker told her while he was rubbing her breast, "This is our secret." (Doc. 71-1,142:16-19; Doc. 71-19,165:9-16).

18.     Acker had his baby with him at the house, and the baby started to cry. Acker tried to persuade Kristin to play with the baby's foot, which was "sitting at his penis." (Doc. 71-1 at p. 59; Doc. 71-1, 52:18-23).

19.     Acker then left to feed the baby but returned in the afternoon. (Doc. 71-1, 53:6-54:19). Hurt testified that "[w]hen I was sitting on the couch away from him after the incident where he had rubbed my breasts ... I could see up his shorts and see his penis." (Doc. 71-1, 51:20-23).

20.     The next day, Kristin told her mother what had happened. (Doc. 71-1, 56:22-57:16; Doc. 71-2, 34:23-35:14). Later that day, Acker came to the house and stayed briefly before leaving, then returned again; this time, however, Kristin would not let him in and locked the door, then called her mother when Acker kept trying to enter. (Doc. 71-1, 58:3-59:21).

### D.     Hurt's Mother Reports the Abuse to DHR, which Investigates, and, After a Contested Hearing, Issues a Finding of "Reason to Suspect" Child Abuse Requiring an Entry in the Central Registry.

21.     Kristin's mother reported these incidents to the Alabama Department of Human Resources shortly after they happened, in 1991. (Doc. 71-1, 66:14-23; Doc. 71-2,

36:6-18).

22.     In the fall of 1991, Ms. Lopez also reported Acker's abuse of Kristin to Shelby County Superintendent of Schools Norma Rogers. (Doc. 71-3,11:15-13:23).

23.     Kristin was interviewed by a DHR employee in the fall of 1991, when she was in sixth grade, and later gave testimony in a DHR hearing in February and June of 1992. (Doc. 71-1, 67:1-68:21, 88:11-15; Doc. 71-2, 62:11-16; Doc. 71-2 at p. 43; EX D, PX 10 at 0014-0015).

24.     Acker continued to teach while DHR investigated. (Doc. 71-19, 43:17-19). Acker's principal, Dr. Tommie Harrison, knew about the DHR investigation. (Doc. 71-19, 47:2-10).

25.     The hearing officer, Lamar Loper, issued a decision in October, 1992 finding "reason to suspect" child abuse. (EX D at 0026). This decision was received by Superintendent Rogers along with a letter from Renee Williams, director of the Shelby County DHR, stating that "[a] founded determination has been entered into the State Central Registry." (EX D at 0013; Doc. 71-3, 23:30-24:23; 25:11-18).

26.     Acker remained on the Central Registry until his arrest in 2012. (Doc. 71-19,153:15-154:8).

27.     Loper's decision states, "the preponderance of the evidence showed that Kristin Lopez was sexually abused and that abuse was perpetrated by Danny Acker at the Lopez's residence on August 6, 1991. (EX C at D00121-122). The report further

states, "Danny Acker intentionally touched Kristin's breast, an intimate part of her body, by placing his hand under her shirt and then under her bra." (EX C D00122).

28.    Rogers provided Loper's decision to the school board. (EX E, PX 18; Doc. 71-3, 51:15-52:6; 89:18-23). Rogers is very certain that she provided the Board with a copy of DHR's final  report. (Doc. 71-3, 28:6-10; 32:12-17; 34:19-35:22; 52:2-12).

### E.    After Receiving the DHR Decision of Hearing Officer Loper, Superintendent Rogers Suspends Acker With Pay.

29.    After receiving Loper's decision from DHR, Rogers recommended that Acker be suspended, and the School Board approved his suspension with pay, effective October 19, 1991. (Doc. 71-3, 27:21-28:8; EX C at D0099-D00101.)

30.    Doebler testified that it was Rogers's responsibility to conduct a thorough investigation into the allegations of abuse against Acker and to share the results of her investigation with the Board. (Doc. 71-4,154:11-23; Doc. 71-6, 122:8-16).

31.    Around the time of the hearing officer's decision, in October, 1992, Rogers had Evan Major, Director of Administration, check with the principals of the schools where Acker had taught to see whether there had been any other complaints of inappropriate conduct. (Doc. 71-3,15:6-23:5; EX F, PX 35). There had not. (EX F).

32.    Majors had no background or training in investigating complaints of sexual molestation. (Doc. 71-3, 21:1-4). Rogers similarly had no training regarding how to handle allegations of sexual abuse of a child by a teacher. (Doc. 71-3, 26:18-22).

33.     Other than send Evan Majors to check with the principals, Superintendent Rogers did nothing more to investigate whether Acker had engaged in inappropriate sexual conduct with any female students. (Doc. 71-3, 22:18-22,. 72:7-73:3). Rogers testified, "I depend on the principals to handle the observing of teachers and to deal with the students and that they report to me." (Doc. 71-3, 74:6-8).

34.     No one from the School Board or Superintendent's Office asked Acker any questions about whether he had done anything inappropriate with children until the School Board hearing in 1993. (Doc. 71-19, 151:3-10, 190:4-16).

35.     Lopez learned of the DHR's "reason to suspect" finding from Rogers. (Doc. 71-2, 39:16-21; EX D). Rogers informed Lopez that the hearing officer had found reason to suspect child abuse; that she (Rogers) believed Kristin; and that she was going to recommend that Acker be terminated. (Doc. 71-2, 40:13-19).

36.     Rogers understood the term "founded determination" to mean that DHR had found Hurt's allegations to be true. (Doc. 71-3, 31:9-23).

## F.     Acker and His Friends Begin a Campaign to Discredit Hurt.

37.     Kristin testified before the grand jury in 1992. (Doc. 71-1,71:23-72:17). At the grand jury, she was asked "do you know what harm you will cause this man, are you sure you are not making things up, did you get this from watching Oprah, were you doing things with boys so you made this up, do you realize what you are going to do to this man if he did do this. Just a bunch of questions that made me -- made it feel

just hurtful and just -- that I couldn't trust anybody." (Doc. 71-1,72:5-17).

38.    After Kristin reported the abuse, parents told their children that Kristin was a liar, that they were not allowed to hang out with her, that she was promiscuous, that she made up stories, that she was just doing this for attention. (Doc. 71-1, 99:15-20; 107:16-20). Some parents made comments to Kristin directly. (Doc. 71-1, 100:4-18). Kristin testified, "I was bullied, I was thrown against lockers, I was called a whore, a slut, a bitch, a cunt."   (Doc. 71-1, 83:21-84:1). Her photo was left out of the yearbook. (Doc. 71-1, 102:10-15; Lopez Depo. EX 5, Doc. 71-2 at p. 70). This bullying took place during Kristin's seventh grade year at Thompson Middle School, and as a result of the bullying, Hurts's parents arranged for her to transfer halfway through the year to Riverchase in 1992. (Doc. 71-1, 88:16-23; 28:18-29:15; Lopez Depo. EX 3, Doc. 71-2 at p. 68; Doc. 71-2, 65:11-66:2).

39.    Acker told the police, "when accusations came out, the students ganged up on her, you know..." (EX A, 93:18-21).

40.    After she reported Acker's abuse, Kristin was also treated differently by her teachers: "If I didn't understand something, they wouldn't allow me to come close enough to ask them questions. They were -- in my opinion, I thought they were scared that I would accuse them of doing anything. I didn't have -- I felt isolated. I didn't have friends. I didn't get the -- the studies that I needed as a child growing up, needing school, because I didn't get to have those study groups with friends because

I had no friends." (Doc. 71-2, 86:14-23).

41.    On December 14, 1992, an Associated Press article with the headline "Molestation complaint causes support for teacher" appeared in various newspapers, including the Mobile Register. (Lopez Dep. Ex. 6, Doc. 71-2 at p. 71). The article concluded with a quote from a child abuse prevention advocate that "[a] very distinct message has been put out by this community ... It's a distinct message that you are not going to be well received if you step forward." (Doc. 71-2 at p. 71).

42.    Prior to 2013, the Board had no sexual harassment policy addressing teacher-student sexual harassment, and did not provide students or parents with any instructions regarding what they are to do if a student is being molested by a teacher or staff member. (Doc. 71-4, 161:20-22, 164:15-23; Doc. 71-6, 27:5-10, 131:19-132:5). The Board takes no steps to protect students from abuse by teachers. (Doc. 71-4, 166:7-10, 173:17-22; Doc. 71-6, 27:11-21).

   **G.    The School Board Conducts a Hearing Regarding Whether to Accept Superintendent Rogers's Recommendation to Terminate Acker.**

43.    Lee Doebler was president of the school board from 1992 through 2012. (Doc. 71-4, 19:16-18). His responsibilities included leading school board meetings. (Doc. 71-4, 19:23-20:10). The other board members included Steve Martin, Donna Morris, Susan Bagley, and Cindy Forrester. (Doc. 71-4, 47:18-23).

44.    Doebler knew Acker's father, a County Commissioner, because they both had

been running for office at the same time, had met at a Republican party committee meeting, and because Acker's father was also the principal of the vocational high school in Shelby County. (Doc. 71-4, 29:15-21; 30:19-31:6). One of the other Commissioners on the County Commission with Acker, Freddie Ard, was the person who had recruited Doebler to run for the School Board. (Doc. 71-4, 183:19-184:7).

45.     Acker's father approached Superintendent Rogers early in the process, after she had issued the letter of suspension, and asked "why did you do that?" (Doc. 71-3, 111:21-112:8). Rogers testified, "That plays a role ... The fact that he, you know, he and his wife are both well respected and teachers and he's on the commission. I think that carries a lot of weight that he's from a good family." (Doc. 71-3, 113:20-114:2).

46.     Steve Martin was vice president of the School Board in 1992 and served on the board for 26 years. (Doc. 71-6, 18:16-19:4).

47.     Doebler testified that the board's role is limited to voting on the recommendations of the superintendent, and that the board cannot make any decisions without a recommendation from the superintendent. (Doc. 71-4, 23:16-22). Doebler agreed that the board is charged with administration and management of the public school system, through approving or disapproving recommendations of the superintendent. (Doc. 71-4, 24:15-20). All recommendations by the superintendent that a teacher be terminated must be approved by the board. (Doc. 71-4, 27:22-28:23).

48.     In the fall of 1992, Rogers recommended to the board that Acker's contract be

non-renewed, i.e., that he be terminated, and Acker was suspended pending a hearing. (EX C at 0099; Doc. 71-4, 28:16-23, 33:4-17; Doc. 71-3, 70:14-18).

49. On February 8-9, 1993, the Board of Education held a hearing regarding whether to uphold the Superintendent's recommendation that Acker be terminated. (EX G, PX 15). According to Doebler, this hearing was essentially an adversarial process with the superintendent going against the teacher and the Board sitting in judgment. (Doc. 71-4, 68:19-69:4). The hearing was conducted by Donald Sweeney, whom Doebler identified as the attorney for the Superintendent. (Doc. 71-4, 70:1-8).

50. The witnesses at the hearing included Acker; Kristin Hurt; her mother, Linda Lopez; two children, April Harris and Jennifer Wilson; and a Ms. McNeely who was a family friend of the Lopez family. (Doc. 71-19, 56:4-12; 69:19-71:14; 197:4-11).

51. The exhibits considered at the hearing are documents D00098 through D00134, contained in PX 21. (EX H, PX 20, Doebler's Resp. to Interrogatory No. 2; EX C).

52. Doebler and Martin each admitted in their sworn interrogatory responses that the documents considered by the Board included the letter to Dr. Rogers stating that "a founded determination has been entered in the state central registry" (EX C at D00108) and DHR's lengthy final decision dated 6/29/1992 ("DHR Report") establishing "reason to suspect child abuse" (EX C at D00110-D00122), both of which were marked as exhibits and produced by the Board in this case. (EX H, Doebler's Resp. to Interr. No. 2; EX I, PX 33, Martin's Resp. to Interr. No. 2).

### H.   The School Board Members Now Claim that Superintendent Rogers Failed to Provide Loper's Decision, and that the Final DHR Decision Would Have Caused Them to Terminate Acker in 1993.

53.   In Doebler's deposition, contrary to his sworn interrogatory answer that the DHR Report was among the exhibits the Board considered, Doebler was certain "[t]hat was not presented at the hearing, no." (Doc. 71-4, 40:8-13; 77:17-78:3).

54.   Martin testified that Superintendent Rogers never showed him, and he therefore did not consider at the school board hearing, either the letter from Dr. Rogers stating that "a founded determination has been entered in the state central registry" (EX C at D00108), nor the DHR report establishing "reason to suspect child abuse" (EX C at D00110-D00122), and that the first time he saw the complete DHR report was in an interview with a news reporter, Jon Paepcke, in 2012. (Doc. 71-6, 72:14-17, 33:14-34:6, 94: 2-15). Martin testified that he believed the school board members had never received the complete report from Superintendent Rogers. (Doc. 71-6, 51:1-10).

55.   Donna Morris, another Board Member, likewise testified that she did not have the DHR report. (Doc. 71-8, 17:23-18:5).

56.   Doebler testified, "What we saw from the Department of Human Resources ... was a one-page document that stated there was one reason for suspicion," i.e. the cover letter from Rene Williams to Superintendent Rogers at D00108, which Doebler is sure he saw in 1992. (Doc. 71-4, 40:19-41:2, 74:21-75:4, 138:21-139:2; EX D).

57.   Martin does not recall discussing Acker being found "guilty by a state hearing

official." (Doc. 71-6, 86:8-14). He testified, "[w]hat I understood is that there might – a reason to suspect may be some inappropriate touching," and he also remembered a note "about what color are your panties, something like that." (Doc. 71-6, 31:7-21).

58.     According to Doebler, he was not aware that Kristen "stated in testimony that Mr. Acker would touch and rub her on her bottom when she appeared – when she approached him for assistance," as it says in the DHR report.  (Doc. 71-4, 45:17-22).

59.     Doebler testified, "I don't recall that any of this touching her bottom, usual pattern of interaction, so forth, was presented at the hearing." (Doc. 71-4, 46:10-13).

60.     Doebler and Martin also claimed that the Board did not see or consider the report and evaluation of Kristin's psychiatrist, William H. Grant, M.D., even though that report is marked as Exhibit 8 and was identified as a document considered by the Board at the hearing. (EX C at 132-134; PX 25; PX 26; Doc. 71-4, 56:14-19, 104:4-8, 147:19-21; Doc. 71-6, 102:12-23). Doebler testified that seeing the psychiatrist's report vouching for Kristin's truthfulness might have made a difference in regard to his recommendation to put Acker back with children. (Doc. 71-4, 57:12-15).

61.     As to the issues Doebler claimed the Board did consider, such as the note to Ms. Lopez about the test question, Doebler testified that the question about the underwear on Kristin's was "a stupid thing to do, bit it did not reach the standard for terminating a tenured teacher." (Doc. 71-4, 50:12-51:3, 55:1-20). Martin testified, "we didn't try ... to speculate on what was behind the motive and all this stuff and

why this was going on," but that he thought "it may be something from a immature, lack of experience. I don't think it was appropriate." (Doc. 71-6, 96:7-9).

62.     The only evidence that Board member Donna Morris remembers being presented was the note that Acker wrote to Kristin's mother. (Doc. 71-8, 28:1-4).

### I.     The School Board Either Was Deliberately Indifferent to DHR's Findings of Abuse in the DHR Report, or Superintendent Rogers Was Deliberately Indifferent in Failing to Provide the Board with the DHR Report.

63.     Doebler understood that the standard applied by the board was that Mr. Acker's guilt had to be proved by "clear evidence," which in Doebler's mind means "beyond any doubt," before the teacher could be removed from his job. (Doc. 71-4, 61:5-18).

64.     Doebler testified that the Board did not ask the Superintendent to provide DHR's final decision even though some documents the board had stated "See attached final decision." (Doc. 71-4, 49:23-50:11, 65:2-17, 75:8-76:5; 79:22-80:4).

65.     Doebler's position in this lawsuit is that the Board was either misinformed by Superintendent Rogers, or that she did not give the Board all the facts she had, such as the final written decision from DHR, such that the Board did not have sufficient information to make an informed decision. (Doc. 71-4, 67:22-68:10; 155:6-156:2).

66.     Martin likewise testified "...I was asked to make a decision without adequate – without the total evidence. I was not given the total evidence, and I was upset because I was not given it. There is nothing I can do about it." (Doc. 71-6, 52:6-13).

Martin believes that he did not have all the facts because the superintendent did not provide him with the information he should have had, and that the superintendent did not do her job. (Doc. 71-6, 101:12-16; 126:7-15).

67. When asked, "[d]o you think your superintendents are indifferent to children being molested?" Martin answered, "Depends on the superintendent." (Doc. 71-6, 141:4-6). Regarding Superintendent Rogers, Martin testified, "I wouldn't say she was indifferent, but ... I can't speak for her priorities." (Doc. 71-6, 141:9-15).

68. Doebler further testified that it is "very possible" that the Board would have made a different decision had it seen the complete DHR report, EX C at D00110-D00122. However, even now, in hindsight, Doebler claims he "can't say for sure" whether having the full DHR report would have changed anything. (Doc. 71-4, 41:13-16; 114:3-14). Doebler maintains that "[b]ased on the evidence we had at the time, we made the only decision we could make." (Doc. 71-4, 41:22-23).

69. Martin testified that if he had had the DHR report, he would have voted to terminate Acker. (Doc. 71-6, 179:6-19). He agreed that if the superintendent had fully informed the board of what she knew at the time, including the final DHR report, the board would have been able to make a fully informed decision and pull Mr. Acker out of the system where he could not molest children again. (Doc. 71-6, 182:1-13).

70. Contradicting his current testimony that he did not have the full DHR report, Doebler wrote in a letter to Ms. Carpenter in 1993 that he had seen it: "You close

your letter by claiming Christianity and stating 'may God have mercy on your soul.'

Let me assure you that I have a personal relationship with Jesus Christ and I have

absolutely no concern for the safety of my soul . . . <u>My colleagues and I read the DHR</u>

<u>report</u> and listened to <u>all</u> 8 1/2 hours of testimony and all five of us independently

reached the same conclusion ... Let me remind you that the DHR report did not find

Mr. Acker guilty, but found 'reason to suspect.'" (EX E) (emphasis added).[1]

71.     Doebler now claims that "the DHR report we were aware of was not the full

report." (Doc. 71-4,112:12-15, 113:2-13).

72.     Further contradicting Doebler's testimony, Rogers testified, "I kept nothing

from the board." (Doc. 71-3, 51:15-52:6). Rogers agreed that she gave every scrap of

paper that she had from DHR to the board, including the final decision. (Doc. 71-3,

89:18-23). Rogers is clear that she provided the Board with a copy of DHR's final

report. (Doc. 71-3, 28:6-10; 32:12-17; 34:19-35:22; 52:2-12).

73.     Acker, who was present at the hearing, testified that he was asked questions

from the DHR report, and that it was clear the school board members had reviewed

the full report. (Doc. 71-19,192:8-193:7).

74.     Moreover, Kristin Hurt gave testimony before the school board in this hearing.

---

[1]Prophetically, Ms. Carpenter's letter to Doebler had stated, "To all of you who put
Danny Acker back amongst the children, may God have mercy upon your soul when his next
victim comes forward." (EX J, PX 17). Doebler's response was "Let me assure you that I have a
personal relationship with Jesus Christ and I have absolutely no concern for the safety of my
soul." (EX E).

(Doc. 71-1, 74:20-84:1). In her 1993 testimony before the Board, Kristin told the Board about Acker rubbing her behind when she asked him questions; about the test question asking the color of her panties; and about Acker coming to her home and rubbing her breasts, and trying to get her to play with his penis. (Doc. 71-1,78:6-14).

### J.    The Board Disregarded Testimony from Hurt and Her Psychiatrist and Allowed Acker to Present Evidence of the Child's Alleged Sexual History.

75.    Other witnesses at the hearing included Dr. Grant, Kristin's psychiatrist. (Doc. 71-2, 74:18-75:2). Doebler's letter to Ms. Carpenter states that "[w]hile I will not comment on the specifics of the testimony, I will tell you that I felt some of those 'trained professionals' were extremely unprepared and very cavalier about testifying," suggesting that the Board simply disregarded Dr. Grant's testimony. (EX E).

76.    Acker remembers Dr. Grant testifying that Kristin "couldn't be making this up ... that it's not in her best interest." (Doc. 71-19, 201:12-15).

77.    However, the Board allowed at least some testimony from a sixteen-year old boy who had supposedly been intimate with Kristin, who at the time was eleven, for the purpose of "besmirching" Kristin's character. (EX K, PX 24; Doc. 71-4, 97:16-98:7, 135:12-18). Doebler did not think there was anything illegal about a sixteen year old having sexual conduct with a girl under twelve. (Doc. 71-4, 132:22-135:22).

78.    At the hearing, the Board members asked Hurt if she knew that she was ruining a man's life; if she was sexually active; if her parents had done anything to her; if she

had "seen this off of Oprah." (Doc. 71-1, 78:23-79:5). She was asked why she would "accuse such a wonderful teacher." (Doc. 71-1, 79:6-8).

79.     As she was sitting in the room where she and her mother were placed following her testimony, Kristin saw other children, her peers, including Jennifer Wilson and Dani Kennedy, being led in to testify. (Doc. 71-1, 82:1-83:1).

80.     Kristin understands these witnesses were called to discredit her and to attack her character. (Doc. 71-1, 83:21-84:6). Acker confirmed that Jennifer Wilson was called to testify to Kristin's alleged sexual conduct with her boyfriend. (Doc. 71-19, 56:18-57:20). There was also testimony about Kristin's alleged behavior on the bus, "that she always went to the back of the bus, and sat with the boys, and then she'd run up to the bus driver and complain about being touched..." (Doc. 71-19, 58:16-20).

81.     The Board also allowed numerous character witnesses on behalf of Acker, and Doebler testified, "the fact that there were so many character witnesses on his behalf probably did factor in to some extent..." (Doc. 71-4, 100:3-6).

82.     Prior to the hearing, Doebler received a report from a community member, Mrs. Carpenter, that there were two other girls who had come forward with charges against Acker; however, Doebler testified that he may not have communicated this information to the Board's attorney or done anything else to find out whether there were other victims. (EX E; Doc. 71-4,125:7-128:9). Even if he had communicated this information to Mr. Sweeney, the Board's attorney, Doebler did not ask Ms.

Carpenter to provide him with the names of the other girls. (Doc. 71-4,129:22-131:1).

83.    Similarly, the DHR Hearing Officer's decision references "allegations of fondling other children," suggesting that other victims existed in 1992 whose names have not been disclosed.  (EX L, PX 12 at 230).

**K.    The School Board Returned Acker to the Classroom Despite DHR's Finding of Abuse, Allowing Him to Continue Abusing Children for the Next Twenty Years.**

84.    After a lengthy executive session, the School Board reconvened at 2:32 AM on February 9, 1993, and voted unanimously to reject the motion to terminate Acker's employment, returning him to the classroom. (EX G; Doc. 71-4, 106:1-107:4).

85.    According to Doebler and Martin, the school board recommended to the Superintendent that Acker be monitored going forward after the hearing. (Doc. 71-4, 62:1-21; 96:14-18; 123:8-124:10). Doebler testified that monitoring  means "to have the principle keep a very close eye on it," including being in touch with parents to see if there are any complaints. (Doc. 71-4, 63:18-64:5).

**L.    The School Board and Superintendent Failed to Monitor Acker and Failed to Protect Hurt from Retaliation for Reporting Abuse.**

86.    Superintendent Rogers testified, "the principals were told to monitor, keep me posted if anything occurred, and I never heard any more." (Doc. 71-3, 52:17-21). However, Rogers clarified that the principals were just to "observe Danny as any other teacher since he was – it was determined that he was not guilty." (Doc. 71-3,

53:20-16). Acker was never aware of any monitoring. (Doc. 71-19, 37:13-18).

87.     In a letter dated March 18, 1993 and stamped "received" on May 3, 1993, Ms. Carpenter reported to the School Board that as a result of her accusations against Acker, Kristin had been "dragged through the mud and called 'whore' and 'liar.'" (EX M, PX 16). However, Doebler did nothing to figure out whether this was true or to investigate the matter. (Doc. 71-4, 137:11-138:8). Martin testified that the Board did not do anything to protect Kristin from retaliation. (Doc. 71-6, 161:16-163:15).

88.     Doebler admits that the bullying of Hurt could have a chilling effect on others bringing complaints. (Doc. 71-4, 138:9-14).

89.     After the Board's decision, but while Rogers was still within her term as Superintendent, a Board Member, Susan Bagley, came to her in 1995 and said, "I believe we made a mistake," in regard to the decision not to remove Acker. (Doc. 71-3, 100:11-102:19).

90.     After the School Board hearing, no one told Acker to do anything differently with regard to interacting with students from what he had been doing his whole career. (Doc. 71-19, 195:2-10).

### M.     Hurt Has Suffered Long-Term, Continuing Damages as a Result of the Abuse and the School Board's Failure to Take Remedial Action.

91.     After finishing seventh grade at Riverchase, Kristin transferred to Bibb County, where she experienced numerous problems: "I got in fights. I acted out. I -- my

23

studies went down. I was barely passing. They made sure that I had the IEP and then had me in LD classes, and then finally we got me back on the right track and passed the exit exam to graduate and did my senior year, a lot of it, on my own with a little bit of help." (Doc. 71-1, 89:18-90:6).

92.     After the abuse, Kristin was scared to have male teachers. (Doc. 71-1, 87:15-16). She testified that after reporting the abuse, "[t]hat is when I started having the problems where I had no friends. I didn't care about school. I didn't care if I passed. I failed. I just wanted out of everything. I wanted away from anything that had to do with Shelby County – with all of it." (Doc. 71-1, 99:14-100:3).

93.     Another girl called Kristin and told her that she was brave for doing what she was doing and that she wished she could be as brave as she was because Acker had done it to her, too; however, the girl's parents spoke to Kristin's mother and told her that they didn't want to put their daughter through what Kristin had been through. (Doc. 71-1, 100:21-101:19).

94.     Kristin was under the care of a psychiatrist, Dr. Grant, during this time, beginning in October or 1991 through the time of her testimony before the School Board in 1993. (Doc. 71-1, 108:12-109:20).

95.     Kristin has been diagnosed with posttraumatic stress disorder, which involves nightmares or flashbacks to the abuse. (Doc. 71-1, 113:15-19; 116:3-15). When she worked at the Publix in Pelham, starting in 2006, Acker would come into the store,

and she would experience panic attacks when she saw him. (Doc. 71-1, 120:19-124:6). Likewise, in December 2011, Acker came through her line at the Publix in Helena, where she has worked since 2011, and Kristin suffered a panic attack. (Doc. 71-1, 127:14-129:12; 149:18-150:2).

96.    Acker decided to finally tell the truth in 2012 because "I had seen what it had done to Kristin." (Doc. 71-19, 130:4-6). Acker testified, "because of my lies, basically she became the target for a lot of other students; and she eventually had to leave the school." (Doc. 71-19, 130:7-10). Acker was aware that "she had to sell her home, and, you know, the family moved out of Centerville ... just because the students were giving her a hard time." (EX A, 104:1-7).

**N.    Jane Doe #6**

97.    Jane Doe #6 was born in 1993. (Doc. 71-14, 8:1-4). Acker was her fourth grade teacher. (Doc. 71-14, 15:20-16:16). She testified that "I would go up to the board to work out a problem or whatever it was and he would come up behind me and put his hand on my shoulder and press his whole entire body up against my body at the board and stay there for a while." (Doc. 71-14, 17:3-8). Acker would be aroused when this happened. (Doc. 71-14, 20:18-23). Acker would also lean over her when she was working at her desk and put his hand on hers. (Doc. 71-14 17:8-14).

98.    Acker confessed to touching Jane Doe #6 twice. (EX A, 140:9-141:14).

99.    Jane Doe #6's male classmates informed her that Acker looked down her shirt,

and there was a noticeable bulge in his pants. (Doc. 71-14, 17:20-18:4).

100.  Jane Doe #6 discussed with other girls in the class that "Mr. Acker gets really close at the board, it's annoying." (Doc. 71-14, 21:20-22:4).

### O.   Jane Doe #5

101.  Jane Doe #5 was born in 1993 and was a student on Acker's bus route beginning when she was in the third grade. (Doc. 81-1, 8:4, 21:9-15).

102.  In the fourth grade, she had Acker as a teacher for reading class once per day. (Doc. 81-1, 24:19-25:8). In class, when she and other students were at the board, Acker would stand behind them, grab their wrist as they were writing, and put his private areas against their rear ends. (Doc. 81-1, 25:3-26:17). His pants would "bulge" and he would "get big down there," i.e. have an erection, when he stood pressing against them or "bumped" against them at the board. (Doc. 81-1, 26:15-27:6; 50:19-51:1). Jane Doe #5 testified, "it made me feel gross, just nasty ... It made me feel like there was nothing I could do. He was a teacher, what could I do, ask to leave or tell him I didn't want to do it, do the words or the reading?" (Doc. 81-1, 55:3-9).

103.  Acker would also put female students on his lap at his desk. (Doc. 81-1, 27:2-16). Acker would also let female students have the answers to tests and let them skip out on homework or correct their homework if it was wrong. (Doc. 81-1, 52:22-53:6).

104.  Because of Acker's sexual abuse, Jane Doe #5 used to dread his class, feel "really scared," and would sometimes see the nurse to avoid going. (Doc. 81-1,

54:11-16). After class, the anxiety would linger because she knew she still had to ride the bus with him. (Doc. 81-1, 54:17-21).

105.   Jane Doe #5 was the last one off the bus, and the second child on. When she got on the bus Acker would make comments such as "hello, beautiful," "how are you doing, gorgeous." (Doc. 81-1, 28:7-13). When she got off the bus, Acker would ask her to give him a hug: "In the beginning it was just a nice firm hug and they started progressing into him putting his hands down the back of my pants and touching my butt and sometimes it would last up to maybe five or six seconds and then I would get off the bus." (Doc. 81-1, 28:9-20). Acker would put his hands underneath her underwear when he did this. (Doc. 81-1, 51:11-17). As he would let go from the hug, Acker would bring his hands across Jane Doe #5's chest. (Doc. 81-1, 31:16-32:4).

106.   Jane Doe #5 told her dad that her bus driver "freaked [her] out," and asked him to walk her to the bus stop for a few weeks, hoping it would stop. (Doc. 81-1, 29:18-30:21). Finally, near the end of her fourth grade year, she told Acker that she was going to tell her dad, and then he stopped and asked her not to tell, promising that he would never do it again. (Doc. 81-1, 32:12-23). Acker did not touch Jane Doe #5 again but would stare at her in the mirror of the bus. (Doc. 81-1, 33:11-21). She felt that the abuse was her fault, and she was scared. (Doc. 81-1, 33:19-23).

107.   After Acker was arrested, Jane Doe #5 called the police and reported the abuse. (Doc. 81-1, 35:1-21).

108.   As a result of Acker's abuse, Jane Doe #5 has a hard time trusting male authority in school.  (Doc. 81-1, 38:13-39:4). Relationships have not worked out for her, and she does not trust bosses who are male, and she has a hard time keeping a job with a male boss. (Doc. 81-1, 38:13-39:4; 44:3-9). She has seen a doctor for anxiety, which for her is related to males in position of authority whom she is supposed to trust, and she continues to have crying spells. (Doc. 81-1, 40:3-14, 41:18-44:9).

**P.     Jane Doe #1**

109.   Jane Doe #1 was born in 1995 and was a student in Acker's fourth grade class during the 2005-2006 school year. (Doc. 71-15, 7:10-13; 14:22-17:2).

110.   She testified, "[h]e would always come up to the board when we -- all girls, pretty much, that I can remember, and he would press up against us as we were writing on the board. He would always make sure girls got called up there. I do remember that, girls were favored a lot more than guys were." (Doc. 71-15, 17:10-15). Jane Doe #1 remembers Acker being aroused when he did this to her. (Doc. 71-15, 26:21-27:4). Acker did this while he was teaching. (Doc. 71-15, 27:5-16).

111.   Acker would also dance with girls: "[h]e would pick you up with one arm and then he would like ballroom type dance, but he would be holding you, obviously, because he was way taller than us." (Doc. 71-15, 30:11-18).

112.   One day, Acker called Jane Doe #1 to his desk at the back of the room. (Doc. 71-15, 18:8-22). Acker was entering grades using his numerical keypad, and she said,

"you can type really fast." (Doc. 71-15, 18:13-22). At this point, he started rubbing her back, "and he's like, you know, one day, you will be able to type just as fast as me. And keeps going lower and lower, until he was on my butt and he firmly grabs it. It was no accident. And I obviously jumped and stared at him, and he just stared at me. And then I walked back to my desk and sat down." (Doc. 71-15, 18:15-22).

113.   Jane Doe #1 told her parents what had happened when she got home from school that day. (Doc. 71-15, 21:13-22:10; Doc 71-16, 11:3-12:7). This was near the end of the school year, and her parents tried to keep her out of Acker's class as much as possible, letting her stay home and telling her to stay away from him when she was present, and driving her to and from school so that she didn't have to ride on Acker's bus route. (Doc. 71-15, 22:14-24:9, Doc. 71-16, 13:2-13).

114.   Jane Doe #1's parents discussed the matter and her father recalled, "that Danny Acker had been brought up on charges before, that nothing happened to him, but the girl was run out of Alabaster because nobody believed her. And he said I'm not putting my daughter through that." (Doc. 71-16 11:21-12:3).

115.   Jane Doe #1 testified, "I feel like I'm very untrusting now. I feel like I don't trust anybody a hundred percent. I do feel like that has a lot to do with what happened." (Doc. 71-15, 35:13-36:3; Doc. 71-16, 16:7-23).

**Q.   Jane Doe #2**

116.   Jane Doe #2 was born in 1997. (Doc. 71-12, 6:23-7:3). Acker was her

homeroom teacher when she was nine or ten years old. (Doc. 71-12, 13:1-11).

117.    Acker admits intentionally touching Jane Doe #2's breast. (Doc. 71-19, 81:2-13, 249:12-250:5). She testified, "he bent down to pick up something, maybe a pencil or something, I don't really remember, and when he came back up, he flicked my breast. It severely scared me because I was confused. I was like that is weird." (Doc. 71-12, 14:17-23;15:9-13).

118.    Jane Doe #2 reported this to her mother, who confronted Acker about it during an IEP meeting with Acker and Annie Sexton. (Doc. 71-12, 16:20-17:22; Doc. 71-19, 250:7-251:23; Doc. 71-13, 8:8-21). Annie Sexton, the special education teacher, was present and told Jane Doe #2's mother that Acker would never do this; Jane Doe #2's mother pressed for an apology, and Acker apologized and claimed it was an accident. (Doc. 71-12, 17:13-18:11; Doc. 71-13, 14:5-15:23).

119.    Jane Doe #2 testified, "[a]fter what he did, I have always been fearful of older men. And if I was in a group like in class, I was fine. But if it was just me and the teacher, I can't breathe, I am very terrified, I can't focus. It is like a panic attack. It is very terrifying. I just want to leave. I don't get over that feeling for a good while after it." (Doc. 71-12, 23:16-23). She also has nightmares. (Doc. 71-12, 31:28:8-29:5-15).

### R.    Jane Doe #4

120.    Jane Doe #4 was a passenger on Acker's bus route. (Doc. 71-17, 8:1-12). She was generally the last student to be dropped off at the end of the route. (Doc. 71-17,

8:9-22; Doc. 71-19, 213:1-22).

121.   One day, when Jane Doe #4  was getting off the bus, Acker hugged her, and "he kind of slid his hand down towards my butt, like. He only placed it there for a few seconds, and then he told me to have a good rest of the day." (Doc. 71-17, 9:2-8).

122.   After this, Jane Doe #4  didn't like talking to older men, and didn't like having older men as teachers. (Doc. 71-17, 17:1-16).

**S.     Jane Doe #3**

123.   Jane Doe #3 was born in 1999. (Doc. 71-10, 5:22-6:2).  She was sexually abused by her fourth grade teacher, Daniel Acker, during the 2008-2009 school year. (Doc. 71-10 12:7-23; Doc. 71-19, 77:18-78:17).  Jane Doe #3 testified that the abuse started when "after a while, Mr. Acker had started getting more friendly with me than others. He would talk to me more. He would always help me with my work." (Doc. 71-10, 13:16-22).

124.   Acker became attracted to Jane Doe #3 when, in his view, he observed her masturbating in class. (EX A, 29:3-9; Doc. 71-19, 116:2-120:4). Acker believed she was "looking at my private area," that she "had her hands in her jacket and she was masturbating there, you know, and look at me..." (EX A, 29:5-9). Acker testified that this aroused him. (EX A,  29:15-20).

125.   Jane Doe #3, like Kristin, had difficulty with reading, and the abuse began one day when she failed a computer "Star" test. (Doc. 71-10, 13:23-15:7). After she

31

failed, Acker told her to come to his computer and that he would help her take the test. (Doc. 71-10, 15:9-11). Jane Doe #3 testified:

> So I stand by his desk and he sits in his chair and he pulls up the test, deletes it. He picks me up by my hips and he puts me on his lap. So right then I get shaky and scared and kind of uncomfortable. I put my hand on the mouse, and when I did that, he put his hand over mine. He had one hand on my leg and one hand on the mouse. We are going through clicking and taking the test. At that time he takes his hand and he rubs it up my back. So from my thigh to my back rubbing up and down. When I get done with the test, he had an erection. And I felt it coming on. So I am very uncomfortable. So I am hurrying up with the test and I get off.

(Doc. 71-10, 15:12-16:3).

126.    On each of the next two days, Acker again put Jane Doe #3 on his lap for the Star test, grabbing her by the hips and rubbing her back. (Doc. 71-10, 16:11-17:19).

127.    A few weeks after this, on the day of the pre-SAT test, Jane Doe #3 arrived at school to find that Acker had moved her desk to the back near his desk. (Doc. 71-10, 18:16-22). On this day, the class was watching the "Chronicle of Narnia" movie. (Doc. 71-10, 19:8-11). Jane Doe #3 testified as follows:

> And he turned off the lights and he sits in his desk. And he comes over, he takes his feet and he wraps them around my chair, and he pulls my chair away from my desk towards him.
>
> Q. Is he sitting in a chair doing this?
>
> A. Yes, ma'am. He is sitting in his chair behind me, and I am in front of him in a chair. He pulls my desk -- my chair back towards him.
>
> Q. With his feet?

A. Yes, ma'am, he does. When he does, he puts his hands up my shirt, up my back, rubbing my back. And he takes his thumb and he goes around my belt line and he goes back and forth across my belt line. About that time a teacher -- you could see the light, and a teacher had come in. He pushed me forward and he talked to the teacher and after the teacher was gone, he pulled me back. And at that time I had pulled my jacket – I had a jacket on. I put my hands in my jacket and pulled my jacket tighter. When I did, he tried going up my jacket and he kind of laughed and he said I see you pulled your jacket tighter. I kind of shrugged my shoulders. He said, are you going to tell anybody about this. Again, I shrugged my shoulders, scared to death. And he said if you do, he said I am really good friends with your family, I know where you live.

So at that time I am really scared and I am sitting there shaking. He is putting his hands up my shirt. And he goes up to the front of my shirt and inside my shirt and he rubs my chest back and forth. Then he takes his hand and he goes in my pants. And he is messing with my butt.

(Doc. 71-10, 18:16-21:4; Doc. 71-19, 139:13-22; EX A, 30:15-22; 48:5-18).

128.    The next day, Acker again turned on the "Chronicles of Narnia" after the class

finished testing.

And so he pulls me back with his feet, sits behind me in his chair and I am in my chair, and he pulls me back again. And he puts his hands up my shirt again, up my chest, side to side. This time he goes -- he goes in my vagina and he penetrates inside of me. I get shaky and scared, and it goes on forever.

(Doc. 71-10, 21:8-23).

129.    The next day, Acker pulled Jane Doe #3 out of gym class. (Doc. 71-10, 22:3-

11). She testified,

We go in his room and he sits across from me in his chair, me in my chair. He sits me down, and he takes me by the hands, and he says, [redacted], he said I want you to know that this isn't good of me to do this. He said it is for your future husband, not me. He said I am sorry I have done this, and it won't happen again. So I said, yes, sir, and go back outside.

33

(Doc. 71-10, 22:11-19; Doc. 71-19,81:17-21; 165:17-166:14).

130.    Acker confessed to the police that "one day, I just sort of held her hand there," i.e. on his "private area." (EX A, 29:19-22). Acker inappropriately touched Jane Doe #3 up to ten times. (EX A, 30:10-14; 47:2-4; 65:2-4).

131.    In April, Jane Doe #3 was at 4H camp, a school-sponsored event, and Acker was there. (Doc. 71-10, 22:20-23:10; Doc. 71-19, 121:19-122:7; Confession Tr. 40:8-41:3). Jane Doe #3 was canoeing, and Acker came down and said he wanted to canoe. (Doc. 71-10, 23:7-14). Acker was in a different boat but splashed her and her canoeing partner with his paddle, soaking them. (Doc. 71-10, 23:4-23)  Then Jane Doe #3 went to the rock climb wall, and she was putting on the harness that had to fit between her legs; Acker came over and put hers on for her, and gave her a "creepy" smile that made her feel uncomfortable. (Doc. 71-10:24:3-25:9).

132.    Later, she and Acker were walking and he told her "I saw y'all looking in my bedroom window this morning when I was getting ready." (Doc. 71-10, 25:13-26:5). However, Jane Doe #3 had not been near the window. (Doc. 71-10, 26:1-5).

133.    The next day, Jane Doe #3 asked a female teacher where the basketball courts were, and Acker said "I will take her." (Doc. 71-10, 26:15-27:4). They were walking on a path through the woods when Acker grabbed her shoulder and said her name:

> ...and I turned around and looked at him. At that time he undid his belt and undid mine.

Q. He undid his belt --

A. And then undid my belt. He sticks his hands down my pants under my underwear and sticks his fingers inside of me. He takes my hand and puts my hand on his penis under his clothes and all of that. I snatched my hand away. When I did, he took his hands out and started undoing his belt again. We were almost at the basketball courts. I said I don't want to go to the basketball courts no more. I said I want to go back up. He says okay and we walk up.

(Doc. 71-10, 27:5-20; Doc. 71-19,107:9-112:2; EX A, 67:5-72:5).

134.    The next morning, the last day of the camp, Acker told Jane Doe #3 that he was sorry, that he didn't want her to tell anyone, and that he and she had "something special." (Doc. 71-10, 28:2-29:4; Doc. 71-19, 165:2-5; EX A, 72:12-19). Acker estimates that he and Jane Doe #3 had five more encounters after this, with increasing frequency and intensity. (EX A, 74:8-21).

135.    After this, Jane Doe #3 entered the fifth grade and did not see Acker that year; however, in sixth grade she was getting on the bus, and Acker hugged her, putting his hands down above her rear end and told her he missed her. (Doc. 71-10, 30:12-19).

136.    When Jane Doe #3 was in the seventh grade, she told a family friend about Acker touching her, and the friend told her parents, who went to the police. (Doc. 71-10, 32:3-34:23; Doc 71-11, 10:23-11:23).

137.    As a result of Acker's abuse, Jane Doe #3 testified,

I don't trust teachers. I don't let myself be alone with a teacher. When I don't understand something in class, I will kind of blow it off because if I am alone with a teacher, a male teacher, and most of mine are males, I don't feel comfortable. I just want to get out of there. That has really put a kink in my

grades and all of that with my emotions. I stay stressed because I am not one to let my emotions out. I don't cry. I don't show it. But I have a lot of -- it puts a lot of stress on me, and I have no way to let it out.

(Doc. 71-10, 44:9-21).

138.   Acker estimates that he touched female students in a sexual manner at least fifty times over the years, involving at least twenty young girls. (EX A, 58:14-20; 60:15-21; 82:11-22).

## IV.   Argument

### A.   Equitable Tolling Renders Hurt's Claims Timely.

The Supreme Court has recognized that the "standard rule" is that the statute of limitations period does not commence "until the plaintiff has a complete and present cause of action." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 418 (2005) (internal quotation marks omitted). Unless the statute creating a limitations period clearly indicates otherwise, "a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (quoting *Rawlings v. Ray*, 312 U.S. 96, 98 (1941)). In civil rights cases, these principles have been extended through the principle of "equitable tolling" which is available where, prior to the expiration of the statute of limitations, "the facts supporting a cause of action" were not "apparent to a reasonably prudent person with concern for his or her rights."

*Villarreal v. R.J. Reynolds Tobacco Co.*, 806 F.3d 1288, 1304 (11th Cir. 2015).

That is the situation presented here. Prior to the statute of limitations expiring, Kristin Hurt had no reason to suspect deliberate indifference on the part of Superintendent Rogers, who had recommended Acker's termination, nor any reason to believe that Rogers had not fulfilled her duty to transmit the full DHR report to the School Board.[2] On the contrary, prior to this action, the School Board's public position had been that Doebler and his colleagues had read the DHR report. (EX E).

Mere knowledge by a plaintiff that she has been sexually abused, and that she suffered harm as a result of a school's failure to remedy that abuse, is not sufficient to make out a Title IX cause of action. Rather, to prevail in a Title IX teacher-on-student abuse case, "the plaintiff must be able to 1) identify a person with "authority to take corrective measures in response to actual notice of sexual harassment," 2) demonstrate that the notice was "sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment," and 3) show that the authority figure acted with deliberate indifference to the notice of harassment." *Doe v. School Bd. Of*

---

[2]Doebler's position in this lawsuit, contrary to the position he took in the letter to Ms. Carpenter in 1993, is that the Board was either misinformed by Superintendent Rogers, or that she did not give the Board all the facts that she had, such as the final written decision from DHR, such that the Board did not have sufficient information to make an informed decision. (Doc. 71-4, 67:22-68:10; 155:6-156:2; EX E). Martin likewise testified "...I was asked to make a decision without adequate – without the total evidence. I was not given the total evidence, and I was upset because I was not given it. There is nothing I can do about it." (Doc. 71-6, 52:6-13). Martin believes that he didn't have all the facts because the superintendent did not provide him with the information he should have had, and that the superintendent did not do her job. (Doc. 71-6, 101:12-16; 126:7-15).

*Broward County, Fla*, 604 F.3d 1248, 1254 (11th Cir. 2010).

Assuming (as the court must for the purposes of this summary judgment motion) that the jury lays the fault at Superintendent Rogers's door and concludes that she was deliberately indifferent in failing to provide the DHR report to the School Board in 1992, Hurt could not, through reasonable diligence, have discovered this fact until Doebler's and Martin's surprising deposition testimony that the Superintendent had the DHR report, hid it from the board, and lied about giving it to them. If the jury accepts the Board's new position, then it must necessarily discount Doebler's previous assertions in his 1993 letter to Ms. Carpenter that the Board had read and considered the report. Similarly, the jury must likewise necessarily disregard the conflicting testimony of Superintendent Rogers that she had provided the Board with a copy of DHR's final report. (Doc. 71-3, 51:15-52:6; 89:18-23; 28:6-10; 32:12-17; 34:19-35:22; 52:2-12). Taking the facts in the light most favorable to the plaintiff,, Kristin Hurt did not know until Defendant Doebler's deposition that Superintendent Rogers had been deliberately indifferent in concealing DHR Administrative Hearing Officer Loper's final report from the school board, leading to Acker being returned to the classroom and Hurt being subjected to a hostile environment so severe that she had to withdraw and transfer schools.

The motives of either the School Board or Superintendent Rogers in concealing her failure to provide the Hearing Officer's report to the board are immaterial:

> After all, when evidence of discrimination is deliberately hidden, even a reasonably prudent person would have little opportunity to uncover it. But there are circumstances other than concealment and misrepresentation which place relevant facts beyond the reach of a reasonably prudent victim of discrimination. In these cases the ultimate question is not whether [a defendant] deliberately hid facts. Rather, we ask whether reasonable prudence would have resulted in the plaintiff uncovering hidden facts earlier.

*Villarreal*, 806 F.3d at 1305 (11th Cir.2015). What matters here, as in *Villareal* and the cases it cites, is that "the clock does not begin to run until [the plaintiff] had enough information to support the cause of action." *Id.* at 1305 (citing *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1026 (11th Cir. 1994).

Because a reasonable jury could conclude that the clock did not begin to run on Hurt's claims until the depositions of Doebler and Martin, Defendants' motion for summary judgment on the statute of limitations issue should be denied.

### B.   A Reasonable Jury Could Find that the Board and Norma Rogers Had Actual Notice of Acker's Abuse of Female Students and Acted with Reckless Disregard.

The School Board's sole argument is that the Jane Doe Plaintiffs "can offer no evidence that anyone with authority to institute corrective action had actual knowledge of Acker's touching them and their claims fail as a matter of law." (Doc. 71 at 19).[3]  However, Plaintiffs need not show that "a particular teacher would abuse

---

[3]To prevail in a Title IX teacher-on student abuse case, Plaintiffs need only "1) identify a person with 'authority to take corrective measures in response to actual notice of sexual harassment,' 2) demonstrate that the notice was 'sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment,' and 3) show that the authority figure acted with deliberate indifference to the notice of harassment.'" *Doe v. School Bd. Of Broward County, Fla,*

a particular student" in order to establish notice to the Board or another responsible official. *Rosa H. v. San Elizario Indep. School District*, 1906 F.3d 648, 649 (5th Cir. 1997). Rather, they may prevail "by establishing that the school district failed to act even though it knew that [Acker] posed a substantial risk of harassing students in general." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843-44 (1994).[4]

Defendant cites Alabama authority suggesting that only the Board is an "appropriate person" for imputing Title IX notice. However, as Defendant observes, the Board "can only act upon the recommendation of the superintendent," (Doc. 72 at 19). Accordingly, the Superintendent is an "appropriate person" for imputing actual notice as well. (See Doebler 23:16-22; 24:15-20; 27:22-28:23); *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 279 (1998). See *Doe v. Autauga County Bd. of Educ.*, 2007 U.S. Dist. LEXIS 81951 (M.D. Ala. Nov. 5, 2007) (collecting cases and

---

604 F.3d 1248, 1254 (11th Cir. 2010) . Students who are subjected to a hostile environment as a result of a teacher's abuse need not establish that the teacher's misconduct was so severe, pervasive, and objectively offensive that it denied them equal access to educational programs or opportunities. *J.F.K. v. Troup County Sch. Dist.*, 678 F.3d 1254, 1256 (11th Cir. 2012). Similarly, they need not show that the harassment was "unwelcome." *Id.* (stating "such an inquiry has never been part of the teacher-on-student harassment calculus.")

[4]See also *Baynard v. Malone*, 268 F.3d 228, 238 (4th Cir. 2001) ("[w]e note that a Title IX plaintiff is not required to demonstrate actual knowledge that a particular student was being abused.") The Eleventh Circuit has cited *Baynard* approvingly for this proposition and reasoned, "[w]e have held in a Title IX student-on-student harassment case that the plaintiff sufficiently alleged actual notice where the primary substance of that notice differed significantly from the circumstances of the plaintiff's harassment." *Doe v. Sch. Bd.*, 604 F.3d 1248, 1257 (11th Cir. 2010). The *Doe* court also held that "the simple fact that these prior incidents were unconfirmed and did not escalate to a violent sexual assault akin to Doe's cannot as a matter of law absolve the School Board of Title IX liability." *Doe v. Sch. Bd.*, 604 F.3d 1248, 1259 (11th Cir. 2010).

observing that "at a minimum, the superintendent of a school district is an appropriate person with authority to institute corrective measures on the district's behalf.")

With this framework in mind, Defendants' motion overlooks that in 1992, the School Board received actual notice from Superintendent Rogers that "the preponderance of the evidence showed that Kristin Lopez was sexually abused and that abuse was perpetrated by Danny Acker at the Lopez's residence on August 6, 1991," and that "Danny Acker intentionally touched Kristin's breast, an intimate part of her body, by placing his hand under her shirt and then under her bra."  (EX C at D00121-122). The jury could reasonably credit Superintendent Rogers's testimony that she provided the full DHR Report containing the above language to the Board in 1993. Despite being aware of these findings, the School Board voted to return Acker to the classroom, where he remained for the next twenty years, with Hurt's ostracization serving as a stark warning to the parents of any other child who might consider coming forward. On these facts, the jury could reasonably conclude that the Board was deliberately indifferent to the DHR report's scathing contents and to the likelihood that Acker would repeat his molestation of female students in the future.

Defendant's brief states "When the board had actual knowledge in January 2012 (after Acker's arrest), it immediately terminated Acker's employment..." (Doc. 73 at 20). This argument overlooks the fact that Defendant had actual notice in 1993. Importantly, Doebler continued to serve as president, and Steve Martin also remained

on the Board, from 1993 through 2012, meaning that actual notice to the Board persisted throughout the time Acker was sexually abusing the Jane Doe plaintiffs, up to and including the time of Acker's arrest. Prophetically, Ms. Carpenter's letter 1992 to Doebler stated, "To all of you who put Danny Acker back amongst the children, may God have mercy upon your soul when his next victim comes forward." (EX J). Doebler's written response was "Let me assure you that I have a personal relationship with Jesus Christ and I have absolutely no concern for the safety of my soul." (EX E). Doebler, in fact, was still the School Board President when the next victim came forward in 2012. On the unique facts here, a reasonable jury could conclude that the School Board received actual notice that Acker posed a substantial risk of harassing each and every female student in his classrooms after the Board returned him to work.

Implicitly conceding that the School Board had such notice, Defendants nonetheless argue that the Board Members were not deliberately indifferent in 1993 and thereafter because "[t]he fact that they believed [Acker] does not suggest deliberate indifference, merely fallibility." (Doc. 73 at 22). However, "deliberate indifference exists when an official knows of, and disregards, an excessive risk of harm." *Williams v. Bd. of Regents*, 477 F.3d 1282, 1305 (11th Cir. 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In *Williams*, the Eleventh Circuit posited a hypothetical similar to the case at bar, and concluded that a "university's calculated decision to hire the coach after looking into and verifying his checkered

42

past, combined with its subsequent failure to conduct any monitoring or provide any counseling, would be deliberately indifferent under Title IX." *Id.* at 1305.

Undermining Defendants' position that the School Board was merely "fallible," a material factual dispute exists as to whether the superintendent ever provided the Board with the full DHR report. The School Board members now insist that they never saw the full report, with Martin testifying that if he had seen it, he would have voted to terminate Acker. (Doc. 71-6, 179:6-19). Doebler would not go so far, but agreed that it is "very possible" that the Board would have made a different decision had it seen the complete DHR report, EX C at D00110-D00122. Rogers, for her part, stridently contradicts the Board Members' testimony, insisting "I kept nothing from the board." (Doc. 71-6, 28:6-10; 32:12-17; 34:19-35:22; 52:2-12; 51:15-52:6). Likewise, and similarly inconsistent with his current testimony, Doebler's 1993 letter to Ms. Carpenter states "My colleagues and I read the DHR report..." (EX E). Similarly, Doebler's and Martin's sworn discovery responses establish that the full DHR report was considered by the School Board at the hearing in 1993.

At best, the conflicting testimony of Doebler, Martin, and Rogers gives rise to a credibility dispute that precludes summary judgment as to whether the Board was deliberately indifferent in disregarding the DHR report, or whether Rogers was deliberately indifferent in failing to provide the report to the Board. If the Board had the report, a reasonable jury could conclude that its decision to put Acker back in the

classroom was "clearly unreasonable in light of the known circumstances," *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 648 (1999), especially in light of Martin's testimony that he would have voted to terminate Acker if he'd had the report. If, on the other hand, Superintendent Rogers failed to provide the DHR report to the board and allowed the Board to decide Acker's fate without the benefit of the crucial information it contained regarding Acker's molestation of Kristin Hurt, then a reasonable jury could conclude that <u>she</u> was deliberately indifferent and that this failure was "clearly unreasonable" in light of the "known circumstances" including her admitted total reliance on DHR to investigate Hurt's allegations and the well-reasoned findings of that investigation. Either scenario satisfies the elements of Title IX liability, since both the Board and the Superintendent are "appropriate persons," and a jury could infer that either or both of them acted with deliberate indifference.

Further showing deliberate indifference, neither the School Board nor the Superintendent did anything to monitor Acker after he was returned to the classroom. Although it may be true that "inconclusive investigations are common," *Doe v. School Board,* 604 F.3d at 1262, the investigation in this case was anything but inconclusive. Rather, DHR issued a founded determination supported by factual findings that Acker had, indeed, sexually abused Kristin Hurt. Even if the investigation had been "inconclusive," however, once such an allegation had been made, the Eleventh Circuit has reasoned, "a reasonable response under the known

circumstances may include taking informal corrective action in an abundance of caution to ensure that future misconduct does not occur." *Id.*[5] Here, neither the School Board nor the Superintendent monitored Acker or did anything else to ensure the safety of the female children in his classrooms. As a result, Acker was allowed free reign to continue his molestation during the next twenty years, resulting in the sexual touching of, by his count, over twenty children over the course of his career. (Doc. 71-19, 83:8-15). This satisfies the Eleventh Circuit's standard for deliberate indifference, and the School Board's motion for summary judgment should be denied.

## C.     Plaintiffs' Section 1983 Claims Should Proceed to Trial.

Plaintiff brings claims against the individual board members in their individual capacities under 42 USC Section 1983, and against the Board as a municipal organization subject to suit under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), as the result of "the actions of an official fairly deemed to represent government policy." *Doe v. School Board*, 604 F.3d at 1263 (quoting *Denno v. Sch. Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000). Municipal liability from a single action or decision may be deemed representative of the municipality if the acting official is imbued with final policymaking authority. *Doe v. Sch. Bd.*, 604 F.3d at 1264 (citing *Denno*, 218 F.3d at 1276). Here, the School

---

[5] *See Williams*, 477 F.3d at 1305 (university's decision to hire the coach after verifying his "checkered past," combined with its "subsequent failure to conduct any monitoring or provide any counseling," would be deliberately indifferent under Title IX).

Board is the final policy maker, as its decision to return Acker to the classroom was final and "not subject to meaningful administrative review." *Id.* at 1264.

The deliberate indifference standard applies to a Section 1983 claim basing liability on a municipality's actions in failing to prevent a deprivation of federal rights. *Davis ex rel. Doe v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1376 (11th Cir. 2000). For the same reasons shown above, a reasonable jury could find that the School Board, the final policy maker, acted with deliberate indifference in failing to protect Kristin Hurt from the hostile environment she suffered after reporting the sexual abuse, and similarly failed to protect the Jane Doe Plaintiffs from a substantial likelihood of harm after the Board returned Acker to the classroom. Accordingly, the School Board's motion to dismiss Plaintiffs' Section 1983 claims should be denied.

### D.      Doebler and Martin Are not Entitled to Qualified Immunity.

Similarly, Plaintiff's Section 1983 claims against the individual Board Members should proceed, as the Board members are not entitled to qualified immunity. A reasonable jury could find that both Doebler and Martin had the full DHR report, but were deliberately indifferent to its conclusions and factual findings, and lied about not having the report, as discussed above. Their deliberate indifference to the contents of the report discredited, leading to her ostracization and transfer. See, e.g., *Hill v. Cundiff*, 797 F.3d 948, 979 (11th Cir. 2015) ("[v]iewing the evidence favorably to Doe, doing nothing was a deliberately indifferent response that subjected

46

Doe to further sexual harassment by depriving her of the opportunity to continue attending Sparkman.") Viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could find that Doebler and Martin violated clearly established law in voting to returning Acker to the classroom.[6]

A right may be clearly established for qualified immunity purposes in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Hill, 797 F.3d at 979 (quoting *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (citations omitted)). Looking to this Circuit's "broad statement[s] of principle," is clearly established that a responsible official who fails to take action despite receiving actual notice of sexual harassment is deliberately indifferent. See, e.g., *Hill*, 797 F.3d at 979 (citing *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1261 (11th Cir. 2010) ("[v]iewing all reasonable inferences in favor of Doe, we conclude an official in Blair's position would not have believed

---

[6]Defendant argues that "Doebler and Martin cast two of five votes–even if they had voted otherwise it would not have changed the outcome, yet Plaintiffs have only named them as individual defendants in this case. (Doc. 73 at 5). Defendant cites no authority for the proposition that all possible defendants must be joined in a lawsuit for liability to attach. In fact, the rule in the Eleventh Circuit is that liability in Section 1983 cases is joint and several. *See Finch v. City of Vernon*, 877 F.2d 1497 (11th Cir. 1989).

doing nothing was lawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation.")

Based on the above, the individual defendants are not entitled to qualified immunity, and summary judgment should be denied on Plaintiffs' Equal Protection claims under 42 USC Section 1983 against Lee Doebler and Steve Martin.

### E.   Plaintiffs' State Law Claims Against Doebler and Martin in their Individual Capacities Should Proceed.

Plaintiffs do not seek to maintain state law claims against the School Board or its members in their official capacities; rather, Plaintiffs bring their state law tort claims against Doebler and Martin in their individual capacities.

Defendant's only argument is that Doebler and Martin are entitled to dismissal of Plaintiffs' state law claims based on state discretionary function immunity. However, the Alabama Supreme Court has made clear that state agent discretionary function immunity does not apply in the following situations:

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte Ala. Dep't of Youth Servs.*, 880 So. 2d 393, 404 (Ala. 2003); see also *Ryan v. Hayes*, 831 So. 2d 21, 28 (Ala. 2002) (noting fact-intensive nature of analysis).

In the case at bar, a reasonable jury could find facts showing that Doebler and Martin acted "under a mistaken interpretation of the law," and that their decision to reinstate Acker was willful, malicious, or in bad faith. First, Doebler incorrectly believed that the standard that must be applied by the board was that Acker's guilt had to be proved by "clear evidence," which in Doebler's mind means "beyond any doubt," before the teacher could be removed from his job. (Doc. 71-4, 61:5-18). However, it has never been the law that such a strict standard must be realized before a teacher may be removed from his position. Rather, under the law in effect at the time, a teacher could be removed for "immorality" or "any good or just cause." See *State Tenure Com. v. Madison County Board of Education*, 282 Ala. 658 (Ala. 1968) (stating that "Ala. Code § 52-13-359 (1940) sets out the mode of cancellation of tenure teachers' employment contracts. Grounds for cancellation of such employment contracts are covered by § -13-358. The grounds are: (1) incompetency; (2) insubordination; (3) neglect of duty; (4) immorality; (5) justifiable decrease in the number of teacher positions; (6) or other good and just cause.") The Board's decision was subject to review only to the extent that it was "arbitrarily unjust." *Id.* at 662.

Doebler further labored under a mistaken interpretation of the law when he believed that accepting evidence of Kristin's alleged sexual contact with other children was permissible: the Board allowed at least some testimony from a sixteen-year old boy who had supposedly been intimate with Kristin, who at the time was

49

eleven, for the purpose of "besmirching" Kristin's character. (EX K; Doc. 71-4, 97:16-98:7, 135:12-18). Further showing his mistaken interpretation of the law that led to her injuries, Doebler did not think there was anything illegal about a sixteen year old having sexual conduct with a girl under twelve. (Doc. 71-4,132:22-135:22).

Further showing bad faith, fraud, and maliciousness, both defendants now insist that they never saw the full report, with Martin testifying that if he had seen it, he would have voted to terminate Acker. (Doc. 71-6, 179:6-19). Doebler agreed that it is "very possible" that the Board would have made a different decision had it seen the complete DHR report, EX C at D00110-D00122. Contradicting his testimony in this action, Doebler's letter to Ms. Carpenter states "My colleagues and I read the DHR report..." (EX E). Likewise, as discussed above, Superintendent Rogers is clear that she provided the Board with a copy of DHR's complete report, contradicting Doebler's and Martin's current testimony. (Doc. 71-3, 28:6-10; 32:12-17; 34:19-35:22; 51:15-52:6; 52:2-12). A reasonable jury could infer that Doebler and Martin's current testimony is untruthful, showing bad faith, fraud, and maliciousness.

Based on the above, Defendants' Motion to dismiss Plaintiff's claims against Doebler and Martin on the basis of state discretionary immunity should be denied.

## V. Conclusion

As set forth above, Defendants' Motions for Summary Judgment should be denied.

Respectfully submitted,

/s/ L. William Smith
Jon C. Goldfarb
Daniel E. Arciniegas
Rachel L. McGinley
L. William Smith
Counsel for Plaintiffs

**OF COUNSEL**:
WIGGINS, CHILDS, PANTAZIS, FISHER,
& GOLDFARB LLC.
The Kress Building
30119th Street North
Birmingham, Alabama 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been properly served via the Court's CM/ECF system to the following counsel of record:

Donald B. Sweeney, Jr.
Anne R. Yuengert
Bradley Arrant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: 205-521-8000
Facsimile: 205-521-8800
dsweeney@babc.com
ayuengert@babc.com

Robert M. Ronnlund
Scott, Sullivan, Streetman & Fox, P.C.
2450 Valley Road
Birmingham, AL 35244

205-967-9675
205-967-7563 fax
wscott@sssandf.com
ronnlund@sssandf.com

On this 7th day of March, 2016.

/s/ L. William Smith
OF COUNSEL