# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **KRISTIN HURT, et al,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:13-CV-230-VEH** |
| | ) |
| **SHELBY COUNTY BOARD OF** | ) |
| **EDUCATION, et al,** | ) |
| | ) |
| **Defendants.** | ) |

---

## <u>MEMORANDUM OPINION</u>

This case arises from Daniel Acker, Jr.'s horrific twenty-five year practice of exploiting his position as an elementary school teacher to convert the Shelby County school system into his personal sexual hunting ground. It is an action under Title IX of the Education Amendments of 1972 (codified at 20 U.S.C. § 1681–88), 42 U.S.C. § 1983, and Alabama law by Plaintiffs Kristin Hurt ("Hurt") and six Jane Does, named in the caption Jane Doe #1 – Jane Doe #6 (collectively, "Jane Does"), alleging sex discrimination and conscience-shocking conduct in violation of the Constitution of the United States, the failure to prevent the same, sex discrimination in violation of federal statutes, and tortious conduct under Alabama law. The Plaintiffs have named as defendants the Shelby County Board of Education ("the Board"), Lee

Doebler, Steve Martin, and Dan Acker. Doebler and Martin are named in both their individual and official capacities as members of the Shelby County Board of Education. Doebler, Martin, and the School Board (collectively, "Defendants") have filed motions for summary judgment. The School Board's motion is due to be **GRANTED IN PART AND DENIED IN PART.** Doebler's and Martin's motion will be **GRANTED**.

## STATEMENT OF FACTS[1, 2]

Daniel Acker, Jr., was a fourth grade teacher in Shelby County from 1985 until 2009 and a bus driver from 1992 until 2009, when he retired. (Doc. 71-19 at 23–24, 134). From 2009 to 2012, he worked as a substitute bus driver. (*Id.* at 134, 136). His

---

[1] The court's uniform initial order requires the moving party on summary judgment to list its allegedly undisputed facts in separately numbered paragraphs, and the non-moving party is required to indicate its agreement or disagreement with the moving party's statement of facts. The non-moving party may then set out any additional allegedly undisputed facts. In reply, the moving party may set out its agreement or disagreement with the non-moving party's statement of additional undisputed facts. Here, the defendants, the moving parties, complied with the court's order in their brief in support of summary judgment. The plaintiffs, for the most part, did not dispute the defendants' factual allegations, but they provided twenty-eight pages of "additional" facts that were largely duplicative of the facts alleged by the defendants and laden with redundant allegations of the plaintiffs' own facts, to say nothing of the wealth of flatly irrelevant allegations. This contravenes the spirit, if not the letter, of the court's order, which is designed to facilitate the efficient resolution of motion practice.

[2] In this somewhat unusual case in which the parties largely agree on the facts, the court has summarized the facts based on the admissions of the parties. Irrelevant facts have been excluded, and disputed facts have been resolved in favor of the Plaintiffs, because they are the non-moving parties. *See Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009).

2

father, Daniel Acker, Sr., was the principal of a vocational school in Shelby County and a county commissioner "for a long time," doc. 71-4 at 29:22–30:2, including between the years of 1988 to "1991-ish." (*See id.* at 29:13–32:11). When the name "Acker" is used in this opinion, the court is referring to "Daniel Acker, Jr." His father is denoted by "Acker, Sr.," and the court will occasionally refer to Acker the Younger as "Acker, Jr." when doing so would promote clarity.

For most of Acker, Jr.'s career in education, he used his position to sexually abuse female children in his class or on his bus route. (Doc. 71-19 at 313:13–15, 319:7–15). Aside from one girl who complained as early as 1991—more on that shortly—no one came forward to Acker's superiors or the police until December 2011. He was arrested the following month and terminated from his employment immediately thereafter. Acker later pleaded guilty to molesting each of the plaintiffs in this case and is currently serving a seventeen year prison sentence. (*Id.* at 13:15–20, 9:19–10:2, 12:17–13:14). By the time his predation ended, he estimated that he had sexually abused at least twenty young girls. (Doc. 85-1 at 58:14–20, 60:15–21, 82:11–22).

Lee Doebler served as an elected member of the Shelby County Board of Education from 1988 until 2012, and served as Board president, who conducts the Board meetings, from 1992 until 2012. (Doc. 71-4 at 11, 19–20). Doebler had met

Acker, Sr. at a Republican committee meeting in 1988; Acker, Sr. was running for a seat as a commissioner at the same time Doebler ran for a seat on the School Board. (*Id.* at 29:18–21). Doebler was not close to Acker, Sr. and did not interact with him or work with him, aside from a one-time tour of Acker, Sr.'s school. (*Id.* at 30:3–32:11).[3]

Steve Martin was an elected member of the board from 1988 until 2014. (Doc. 71-5 at 16, 18). In February 1993, there were three other board members: Donna Morris, Cindy Forrester, and Susan Bagley. (Doc. 71-4 at 46–47). The Board members are charged with the administration and management of Shelby County's schools, but their power is limited to approving or disapproving the recommendations of the superintendent. (*Id.* at 23–24). This process also applies to personnel decisions. (*See id.*). Norma Rogers was the superintendent from 1991 until 1995. (Doc. 71-3, 9:22–10:1). Forrester and Martin did not know Acker. (Doc. 71-9 at 23; doc. 71-6 at 193).

Prior to 2013, the Board had no sexual harassment policy addressing teacher student sexual harassment, and did not provide students or parents with any

---

[3] Acker, Jr., testified that Doebler had been his professor at the University of Montevallo, doc. 71-19 at 66:2–5, that Doebler and Acker, Sr., "knew each other," doc. 71-19 at 67:15–18, and that Acker, Jr., had taught Doebler's daughters sometime during the 1980s. (Doc. 71-19 at 65:13–15). Additionally, Acker, Jr., explained that neither Doebler nor Martin were friends with Acker, Sr. (Doc. 71-19 at 68:8–14).

instructions regarding what to do if a student was being molested by a teacher or staff member. (Doc. 71-4 at 161:20-22, 164:15-23; doc. 71-6 at 27:5-10, 131:19- 132:5).

## I.     Acker, Jr.'s Molestation of Kristin Hurt, née Lopez

Kristin Hurt was born in March 1980, doc. 71-1 at 8:9–17, and she had the misfortune of having Acker, Jr. as her fourth grade reading and science teacher from 1989 to 1990. (*Id.* at 33:17–35:13; doc. 71-2 at 18:10–15). She was between nine and ten years old when Acker abused her for his sexual gratification. (*Id.*). He often rubbed Hurt's buttocks in class, especially when she came to his desk and sought his assistance with reading (a skill with which Hurt struggled). (Doc. 71-1 at 28:4-17, 34:13-35:4). On other occasions, he would approach Hurt's desk, ask that she stand, and proceed to stroke her rear. (*Id.*). As a perverse way of saying goodbye when Hurt left the classroom, Acker would place one hand on her shoulder and the other on her buttocks, rubbing it for an extended period of time; in some of these valedictions, Acker would also reach under Hurt's shirt and rub her pants line. (*Id.* at 40:8-17).

Although Hurt initially did not find Acker's conduct objectionable—she "just thought it was something that was okay," *id.* at 35:15–13—she eventually "tried everything to do – not to go next to him." (*Id.* at 141:19-21). Hurt told her mother, Linda Lopez, about Acker touching her rear, and Lopez wanted to report the incidents to Hurt's principal. (*Id.* at 41:3–6). Hurt was unsure in her 2015 deposition whether

she asked her mother not to contact the principal, *id.* at 42:7–13, but Lopez did not report it to anyone during Hurt's fourth grade year. (Doc. 71-2 at 19:9-17; 21:23-22:8). The decision was motivated, at least in part, by Hurt's fear that her friends would "pick on [her]." (Doc. 71-1 at 42:3–13). Hurt told no one other than her mother during the 1989–90 school year. (*Id.* at 43:21–23).

One day, while in fourth grade, some boys in class were trying to look up Hurt's skirt, so she complained to Acker. He responded that "maybe they think there will be a test question about the color of your underwear." (*Id.* at p. 59). The following day, Acker administered a test to his class, and when Hurt reached the last question, she saw that it was: "[W]hat color are Kristin's underwear[?]"(*Id.* at 45:19–23). She looked up at Acker, and "he gave [her] this smirk that made [her] feel very uncomfortable." (*Id.* at 46:3–5). Hurt later testified that "[a]fter I finished the test, I passed it in to him and I wouldn't even look at him, I was so embarrassed. I just wanted out of the classroom at that point in time." (*Id.* at 46:10-13).

After the test was graded and because Hurt had to show the graded test to her mother, *id.* at 47:9–12, Acker attached a note to it that said:

> I thought the last question might need some explanation. Kristin came to me complaining about some boys trying to look up her dress while we were studying. I kidded her saying the boys must think I was going to have a question about her underwear since that was the only thing they

6

> were studying. I promise I'm not a pervert, I just have a strange sense of humor. I assure you this question was only on her copy of the test.

(Doc. 71-2 at 42). Lopez did not report this incident. (*Id.* at 27:19–28:11).

In 1990, Acker moved into a house on the same street where Hurt and Lopez lived. (Doc. 71-1 at 50:19-52:10, p. 59; doc. 71-2 at 30:21-31:11). Between Hurt's fifth and sixth grade years, which was the summer of 1991, Lopez asked Acker if he could be available for Hurt and Hurt's younger brother as an emergency contact while Lopez was away from the house. (Doc. 71-1 at p. 59). Acker decided to do her one better and check on the children at home. (*Id.*).

On August 5, 1991, Acker came, his baby in tow, to the Lopez residence to check on the kids. (*Id.*). Hurt's brother was playing Nintendo in his bedroom during Acker's visit, and Acker and Hurt watched television while the baby sat in Acker's lap. (*Id.*). Prefacing his actions by saying "this is our secret," *id.* at 142:16-19; doc. 71-19 at 165:9-16, Acker put his hand under Hurt's shirt, reached under her brassiere, and rubbed her right breast. (Doc. 71-1 at p. 59). At the same time, Acker tried to get Hurt to play with the infant's foot because it was resting next to his penis. (*Id.*). After a bit, Acker left "to take care of the baby," *id.* at 53:1–2, but he returned in the afternoon. (*Id.* at 53:6-54:19). Hurt did not sit as close to him when he returned, although she indicated that she "could see up his shorts and see his penis." (*Id.* at

7

51:20-23).

Hurt told her mother what had happened on the following day, August 6, 1991. (*Id.* at p. 60). The day after that, August 7, Acker visited again, and Hurt let him into the house, but he did not stay long. (*Id.*). The next time Acker attempted to visit, Hurt locked the door to prevent him from entering. (*Id.*). When Acker persevered in his effort to enter the house, Hurt asked her brother to call Lopez. (*Id.*). Lopez picked the children up took them to her place of work. (*Id.*). Shortly thereafter, Acker called Lopez to explain that he had simply been tickling Hurt and that she had fallen off of the couch, and he had incidentally grazed her breast when trying to keep her from falling. (*Id.*). Lopez then refused to speak with Acker any further, although he continued trying to reach her. (*Id.*).

## II.   **Report and Investigation**

Lopez reported the groping to the Alabama Department of Human Resources ("DHR") and Superintendent Rogers in 1991. (Doc. 71-1 at 66:14-23; doc. 71-2 at 36:6-18 (DHR); doc. 71-3,11:15-13:23 (Rogers)). Acker continued to teach during the DHR investigation, and Tommie Harrison, Acker's principal, was aware of the investigation. (Doc. 71-19 at 43:17-19, 47:2-10). Hurt was interviewed as a part of the investigation, and she later gave testimony in a June 1992 DHR hearing. (Doc. 71-1 at 67:1-68:21, 88:11-15). In October 1992, Lamar Loper, the hearing officer,

issued a decision finding "reason to suspect" child abuse and stated that "the preponderance of the evidence showed that Kristin [Hurt] was sexually abused and that abuse was perpetrated by Danny Acker at the Lopez's residence." (Doc. 85-3 at 25; doc. 85-4 at 16). Further, Loper found that "Danny Acker intentionally touched Kristin's breast, an intimate part of her body, by placing his hand under her shirt and then under her bra." (Doc. 85-3 at 26). A "founded determination" was entered into the State Central Registry. (Doc. 85-4 at 2).

Rogers received notice of the report, the report itself, and the determination around October 14, 1992. (*See* doc. 85-4 at 2). Rogers thereafter recommended to the Board that Acker be suspended, and the Board voted to suspend him with pay on October 15, 1992. (Doc. 85-3 at 5). Rogers is adamant that she provided a copy of Loper's decision to the Board. (Doc. 71-3 at 51:15–52:6, 89:18–23). By letter dated October 19, 1992, Acker was sent notice that the Board was considering cancellation of his employment for " [1] abuse of a child of a sexual nature against a female student . . . [2] engag[ing] in inappropriate oral and written communication with such female, minor student . . . [and, 3] [y]our conduct as alleged and described in the foregoing paragraphs demonstrates a lack of fitness to serve as an instructor." (Doc. 85-3 at 3). The Board set a hearing to determine whether the contract should be permanently canceled. (*Id.*).

After Acker, Jr. received this notice, Acker, Sr. approached Rogers and asked her why she "would have called a board meeting or given . . . the letter of suspension." (Doc. 71-3 at 111:23–112:4). Rogers responded, "Dan, this is something I have to do. . . . [A] department of – the HR Department has made me aware and I have to, this is my job." (*Id.* at 112:5–8). The next time she spoke to Acker, Sr. was at a funeral sometime after 2012. (*Id.* at 112:16–17).

After the hearing was set, it fell to Rogers to investigate Acker, Jr. and, if necessary, develop the case against him before presenting it to the Board at the termination hearing. (Doc. 71-4 at 154:11–23; doc. 71-6 at 122:8–16). To preserve their neutrality, the Board members would not conduct independent investigations. (Doc. 71-8 at 18–19; doc. 71-4 at 152, 159, 212–213; doc. 71-6 at 122). Before the end of October, Rogers directed Evan Major, the Board's Director of Administration, to ask the principals of the schools at which Acker had taught whether there had been any other complaint of misconduct. (Doc. 71-3 at 15:6–23:5). Neither Majors nor Rogers had any background or training in investigation of allegations of child molestation. (Doc. 71-3 at 21:1–4; 26:18–22).

Rogers did nothing more to investigate Hurt's allegations against Acker or whether any other children were molested, *id.* at 22:18–22, 72:7–73:3, because she relies "on the principals to handle the observing of teachers and to deal with the

students that they report to me." (*Id.* at 74:6–8). Additionally, no one from the School Board or Superintendent's Office asked Acker any questions about whether he had done anything inappropriate with children until the School Board hearing in 1993. (Doc. 71-19 at 151:3–10, 190:4–16). Rogers understood the term "founded determination" to mean that DHR had found Hurt's allegations to be true, doc. 71-3, 31:9–23, and Rogers said she personally believed Hurt. (Doc. 71-2 at 40:13–19).

About two weeks before the hearing, Doebler received a telephone call from Beverly Carpenter,[4] a member of the community who claimed to know of two other girls that Acker had molested. (Doc. 71-4 at 125–126). Doebler does not remember if he passed this information on to the superintendent, but he did ask Mrs. Carpenter to pass this information on to Don Sweeney, the attorney for the superintendent. (*Id.* at 126–27). Doebler says he did not pursue this information further himself because he wanted to preserve his neutrality toward Acker. (*Id.* at 128). The DHR report also alluded to "allegations of fondling other children." (Doc. 85-12 at 3).

## III.  **Hurt Faces Retaliation in the Community**

Hurt testified before a grand jury about Acker in 1992. (Doc. 71-1 at

---

[4] For reasons unknown, Plaintiffs attribute great significance to her religious devotion, or at least her concern that the Board members could face the wrath of the Almighty. The religious views of Mrs. Carpenter and the Board members are irrelevant—no matter how many times they raise them. FED R. EVID. 401 (relevance); 610 (religious beliefs may not be used to attack a witness's credibility).

71:23–72:17). After her allegations became public, some parents in the community told their children that Hurt was a liar, that they were not allowed to hang out with her, that she was promiscuous, that she made up stories, that she was just doing this for attention, and some parents made these comments to Hurt directly. (*Id.* at 99:15–20, 100:4–18, 107:16–20). She later testified that "I was bullied, I was thrown against lockers, I was called a whore, a slut, a bitch, a cunt." (*Id.* at 83:21–84:1). As a result of the bullying, Hurt transferred from Thompson Middle School to Riverchase Middle School in the late fall of 1992. (*Id.* at 88:16–23, 28:18–29:15). Hurt's picture was left out of the Thompson Middle School yearbook, although she had transferred before the book was published. (*Id.* at 102:10-15; doc. 71-2, p. 70).

Her teachers also treated her differently after they learned of the allegations. Hurt testified that:

> If I didn't understand something, they wouldn't allow me to come close enough to ask them questions. They were -- in my opinion, I thought they were scared that I would accuse them of doing anything. I didn't have -- I felt isolated. I didn't have friends. I didn't get the -- the studies that I needed as a child growing up, needing school, because I didn't get to have those study groups with friends because I had no friends.

(Doc. 71-1 at 86:14–23).

12

IV.    **The Termination Hearing**

As required by law, the Board conducted a hearing to determine whether to approve or disapprove Rogers's recommendation that Acker be terminated, which was held on February 8–9, 1993. (Doc. 85-7 at 2). Doebler characterized the proceeding as essentially adversarial in nature, with the superintendent adverse to the teacher, while the Board sat in judgment. (Doc. 71-4 at 68:19–69:4). Doebler believed that to terminate Acker, they had to find beyond any doubt that he was guilty. (*Id.* at 61:5-18). The Board heard testimony from, among others, Acker; Hurt; Lopez; two children named April Harris and Jennifer Wilson; a DHR representative; Hurt's psychiatrist, Dr. Grant; a police officer; a friend of the Lopez family, Ms. McNeely; and an unnamed sixteen year old boy. (Doc. 71-19 at 56:4–12, 69:19–71:14, 197:4–11; doc. 71-4 at 98–99; doc. 71-6 at 30–31, 102, 110–112, 151–54, and 157). A number of exhibits were considered as well—at least according to Doebler and Martin's interrogatory responses—and among them were the DHR's report and a report from one of Hurt's psychiatrists. (Doc. 85-8 at 3; doc. 85-9 at 9).

At the hearing, Hurt testified that Acker rubbed her buttocks in class; she described the question on her test about her underwear; and she told the Board about Acker fondling her breasts and attempting to get her to play with his penis. (Doc. 71-1 at 78:6–14). Acker called an unnamed sixteen year old boy, for the purpose of

13

besmirching Hurt's character, to testify that he had been intimate with her. (Doc. 71-4 at 97:16–98:7, 135:12–18).[5] Acker also called Jennifer Wilson to testify to Hurt's sexual conduct with Hurt's alleged boyfriend. (Doc. 71-19, 56:18–57:20).

The Board members asked Hurt if she was aware that this allegation could ruin a man's life, if she was sexually active, if her parents had done anything to her, and if she had "seen this off of Oprah." (Doc. 71-1 at 78:23–79:5). They also asked her why she would "accuse such a wonderful teacher." (*Id.* at 79:6–8). A large number of "character witnesses" were allowed to testify on Acker's behalf. (Doc. 71-4 at 100:3–6).

Looking back from 2015, all Board member Forrester could recall was the length of the hearing. (Doc. 71-9 at 17–18, 21–23). Morris recalls a piece of paper referring to a child's underpants and that the grand jury did not indict Acker. (Doc. 71-8 at 15–16, 26–28, 35–36, 74). Doebler recalls a large number of people having

---

[5]  Apparently, Doebler was (and as of 2015, is) unaware of the age of consent in Alabama. (Doc. 71-4 at 132:22–135:22). Plaintiffs have emphasized this fact, although its relevance to any of the issues in this case is not immediately obvious, and their briefs have added little clarity on this point. Doebler's lack of knowledge is presented by his letter that responds to a letter from Beverly and Jonathan Carpenter, in which the Carpenters said "[the boy] engaged in a heavy petting episode with [Hurt] when she spent the night in their home. Do you think [his mother] might have realized that [Hurt's] mother could press charges for statutory rape, considering the boy was 18 years old?" (Doc. 85-13 at 2). Doebler responded "[t]here are a number of fallacies in your letter. For example, the . . . boy was not 18 as you state. The boy was 16 at the time of the incident and 17 at the time of the hearing. Thus, he would not have been subject to statutory rape charges. I made a point of pursuing that aspect of the situation during the testimony." (Doc. 85-5 at 2). As ill-informed as this attempted "fallac[y]" smackdown was, whether the boy should or could have been arrested is outside the scope of this case.

testified and that DHR had determined there was reason for suspicion that Acker had touched Hurt, that Acker claimed to have touched Hurt's breast incidental to her falling, and that the grand jury did not indict Acker. (Doc. 71-4 at 46, 48–49, 60, 97, 199). He also recalls the panties remark. (*Id.* at 50:12–51:3, 55:1–20). Martin recalled the panties remark, that the grand jury did not indict Acker, that DHR had found reason to suspect (which Martin found to lack evidentiary support), and that Acker had been allowed to visit the Lopez house. (Doc. 71-6 at 30–31, 95–96, 103–04, 111–112, 151–152, 157).

After the hearing, the Board deliberated and discussed everything. (Doc. 71-4 at 150; doc. 71-6 at 144–45). Doebler claims to have made his decision on the basis of everything presented. (Doc. 71-4 at 178, 189). Martin cannot recall the specifics of the Board's deliberations except that they took the job very seriously, looked at the information and discussed the testimony like a jury. (Doc. 71-6 at 144–45, 149). The Board members voted unanimously to reject Rogers's recommendation that Acker be terminated. (Doc. 71-4 at 48). Martin felt the Board members did not have enough evidence to dismiss Acker from employment. (Doc. 71-6 at 157–158).

## IV.   <u>Acker Continues To Prey</u>

The Board recommended that Acker be monitored after the hearing, doc. 71-4 at 62:1–21; 96:14–18; 123:8–124:10, but Rogers only instructed the principals to

"observe Danny as any other teacher since he was – it was determined that he was not guilty." (Doc. 71-3 at 53:20–16). Acker himself was never aware of any monitoring, doc. 71-19 at 37:13–18, and he was not given any instructions to behave differently in his interactions with students. (*Id.* at 195:2–190).

So, he didn't. He harassed Jane Doe #6 in 2003 or 2004 by, among other things, pressing his erection against her back while she wrote on the board, but she did not complain to any adults about his behavior. (Doc. 71-14 at 7–8, 17:3–8, 20:18–23, 36). Acker did the same thing to Jane Doe #5 in 2004 or 2005 and Jane Doe #1 in 2006. (Doc. 81-1 at 26:15–27:6 (Jane Doe #5); doc. 71-15 at 17:10–15 (Jane Doe #1)). He rubbed the back and squeezed the buttocks of the latter. (*Id.* at 18:15–22). Jane Doe #5 did not mention this to anyone. (Doc. 81-1 at 48). Although Jane Doe #1 told her parents—and <u>only</u> her parents—they did not tell anyone else because the last girl to accuse Acker had been "run out of Alabaster because nobody believed her." (Doc. 71-16 at 10).

Jane Doe #2 had a run-in with Acker in 2006. (*See* doc. 71-12 at 13:1–11). One day, he walked over to her at her desk, bent over (as though he was picking something up), and flicked her breast as he came up. (*Id.* at 14:17–23, 15:9–13). She told her mother that evening, and a day or so later, the mother confronted Acker about it during a parent-teacher meeting with him and Annie Sexton, the special education

16

teacher. (*Id.* at 16:20–17:22). Acker denied having touched the girl, and Sexton was adamant that Acker would never do such a thing. (*Id.* at 17:13–18:11). But Jane Doe #2's mother pressed for an apology, so Acker acquiesced, apologized, and claimed it was an accident. (*Id.*). Aside from "ranting" to "a lady at the front desk" whose identity is unknown, Mrs. Jane Doe #2 did not pursue the issue further, nor did her daughter. (*Id.* at 8–12, 20–21).

Acker continued to sexually abuse children. His abuse of Jane Does #4 and #5 occurred when he touched them inappropriately on his bus in 2008 or 2009 (Jane Doe #4) and 2004 or 2005 (Jane Doe # 5). (Doc. 71-17 at 8:1–12; doc. 81-1 at 28). They were each the last student to be dropped off at the time of Acker's predation. He also hugged each of them when they got off the bus. (Doc. 71-17 at 8:9–22; doc. 81-1 at 28). With each girl, Acker would sometimes place his hands low on their backs, near their buttocks, and rest them there for a few seconds. (Doc. 71-17 at 9:2–8; doc. 81-1 at 28, 51). The hugs made both girls uncomfortable. (Doc. 71-17 at 9, 11–12, 13–14; doc. 81-1 at 29–31). Jane Doe #5 confronted Acker about it, who asked her not to tell and promised not to touch her anymore, and he kept his promise to her. (Doc. 81-1 at 32–33). She also told her father that her bus driver "freaked [her] out," and, for a time, he walked her to the bus, which deterred Acker from touching her while her father accompanied her and for about a week after. (*Id.* at 29–31). Jane Doe #4 told

her father that Acker had gotten "real low on her back," but her father dismissed her statement. (Doc. 71-18 at 7–8). Neither girl told anyone else about the touching. (Doc. 71-17 at 14–15; doc. 81-1 at 48).

Jane Doe #3 was in Acker's 4th grade class from 2008 to 2009. (Doc. 71-10 at 5, 12).Three times during the year, he put her on his lap while she was taking a test on the computer, and he put one hand over hers on the mouse while he used his other hand to rub her thigh and back. (*Id.* at 14–17). During the first of these tests, she noticed that he had an erection. (*Id.* at 15–16). On another occasion, Acker returned to his old trick of pressing his erect penis against her while she wrote on the board. (*Id.* at 18, 37–38).

While the class was watching the Chronicles of Narnia, Acker pulled Jane Doe #3's desk toward him, and he proceeded to rub his hands up her shirt, rub her back, move his thumb around the beltline of her pants, rub his hands under her shirt across her chest, and stick his hands down her pants to feel her buttocks. (*Id.* at 19–21). The class continued watching the movie the following day, and Acker continued to molest Jane Doe #3. (*Id.* at 21). This time, he touched her as he had the day before, but he also reached down the front of her pants and penetrated her vagina with this finger. (*Id.*).

Acker apologized the next day and said it would never happen again, but that

was a lie. (*Id.* at 22). At 4-H camp at the end of the school year, Acker stopped while escorting Jane Doe #3 to the basketball courts to undo his belt and hers. (*Id.* at 27). He then stuck his hand into her underwear, penetrated her vagina, and placed her hand on his penis under his clothes. (*Id.*). Upon returning from camp, Acker told her that he was sorry, that he did not want her to tell anyone, and that he had something special with her. (*Id.* at 28). It was unusual for Acker to say things to Jane Doe #3 in the course of molesting her, but, on one other occasion, he asked her if she would tell, and she shrugged in response. (*Id.* at 37). He responded by saying that he was good friends with her family and he knew where she lived. (*Id.*).

Jane Doe #3 initially told two classmates and her younger cousin about Acker's conduct, but she did not tell an adult until she told a family friend in December 2011. (*Id.* at 32, 35–36, 38). She has still never spoken with the Board, nor has her mother. (*Id.* at 49; doc. 71-11 at 9-10). Once she told her mother in 2011, her mother reported Acker's conduct directly to the police. (Doc. 71-11 at 13).

## V.   In 2015, Doebler and Martin Denied They Heard Hurt's Whole Story

The Plaintiffs filed this action in 2013, which naturally had the effect of triggering discovery on the Board's knowledge of, and responses to, Hurt's and the Jane Does' molestations by Acker. From 1993 until 2015, including in their interrogatory responses in 2013, Martin and Doebler maintained that they viewed all

of the listed exhibits from the hearing, especially the letter stating that a founded determination had been reached, and that they had viewed the DHR's final decision. (*See* doc. 85-8 at 3; doc. 85-9 at 9). Also of note, after the Carpenters, two Shelby County residents, wrote to the Board to criticize its handling of Hurt's allegations, Doebler's haughty response (dated May 20, 1993) emphasized that the Carpenters' "letter contains many assumptions and accusations based on rumor and inaccess to the actual testimony," that "[m]y colleagues and I read the DHR report," and that "our decision was based on <u>all</u> of [the] testimony." (Doc. 85-5 at 3) (emphasis in original).

In his deposition, Doebler said he was certain that the DHR report "was not presented at the hearing, no." (Doc. 71-4 at 40:8–13, 7:17–78:3). Doebler described what he saw at the hearing as "a one-page document that stated that there was one reason for suspicion." (*Id.* at 40:19–41:2, 74:21–75:4, 138:21–139:2). Doebler claims to have been unaware in 1993 of Acker touching Hurt's rear or a pattern of interaction between them. (*Id.* at 46:10–13). Martin testified that he never saw and thus did not consider the notice of a founded determination nor the report establishing reason to suspect child abuse. (Doc. 71-6 at 72:14–17, 33:14–34:6, 94:2–15). Donna Morris also claims she did not receive the DHR report. (Doc. 71-8 at 17:23–18:5). For his part, Acker indicated that the questions the Board asked him during the hearing made it clear that the Board had reviewed the full report. (Doc. 71-19 at

192:8–193:7). Likewise, Hurt's testimony was substantially similar to the information contained in the DHR report. (Doc. 71-1 at 78:6–14).

Doebler and Martin now claim that Rogers withheld the report from them; they both believe that they made a decision in 1993 without the benefit of all the facts. (Doc. 71-4 at 67:22–68:10, 155:6-156:2; doc. 71-6 at 101:12–16, 126:7–15). Doebler believes it is "very possible" the Board would have voted to terminate Acker in the face of the full report. (Doc. 71-4 at 41:13–16, 114:3–14). Martin has said that he would definitely have voted to terminate Acker if he had seen the full report in 1993. (Doc. 71-6 at 179:6–19). In contrast, Rogers says "I kept nothing from the board." (Doc. 71-3 at 51:15–52:6).[6] She is adamant she provided them with a copy of the final report. (*Id.* at 28:6–10, 32:12–17. 34:19–35:22, 52:2–12).

## PROCEDURAL HISTORY AND THE CLAIMS FOR RELIEF

The initial complaint in this case was filed on February 1, 2013. (Doc. 1). Listed as plaintiffs there were Jane Does #1–#4 as well as Hurt; the Defendants were the same as they are now. (*Id.*). An amended complaint was filed on February 8, 2013, seeking to use the class action mechanism. (Doc. 10). Acker answered on March 7, 2013, and the other defendants answered on March 27, 2013.  (Doc. 16; doc. 17).

---

[6] The court does not consider the speculative testimony from Rogers, Doebler, and Martin about the weight of Acker, Sr.'s influence on the Board or Rogers's alleged deliberate indifference. *See* FED. R. EVID. 602.

Plaintiffs moved to certify a class under Rule 23(b)(3) on October 15, 2013. (Doc. 27). After receiving briefing, the court denied the motion on August 21, 2014. (Doc. 50). A second amended complaint adding Jane Does #5 and #6 as plaintiffs was filed on December 15, 2014. (Doc. 58).

On January 11, 2016, the Defendants moved to dismiss Jane Doe # 5 for lack of prosecution. (Doc. 68). The same day, all defendants except Acker moved for summary judgment. (Doc. 72; doc. 73). Five days later, the parties moved to stay the case to allow the previously-unavailable Jane Doe #5 to be deposed. (Doc. 75). On February 12, 2016, the parties proposed a new briefing schedule that provided that motions for summary judgment would be under submission by March 21, 2016; the court approved it. (Doc. 77; doc. 79). The Defendants filed supplemental briefing as to Jane Doe #5 on February 22, 2016; Plaintiffs responded to the motions for summary judgment on March 7, 2016. (Doc. 81; doc. 84). Defendants filed their reply on March 21, 2016. (Doc. 87).

On May 26, 2016, the court issued a notice to the parties pursuant to FED. R. CIV. P. 56(f)(2) that it was contemplating granting summary judgment on grounds they had not raised. (Doc. 88). To wit, the court questioned whether loss of consortium was a cause of action in Alabama and whether the Board's actions caused Hurt's injuries. (*Id.*). The court also requested additional briefing on whether the

availability of vicarious liability depended upon the capacity in which the vicariously liable officer was sued, whether equitable tolling could ever be a jury question, and whether a parent can recover for loss of consortium with its child in Alabama. (*Id.*). The parties timely responded.

Before diving into analysis, a good rule of thumb is that you should know what is at stake. The Plaintiffs' complaint asserts something north of 100 claims for relief, if one breaks down the enumerated causes of action by substantive right, plaintiff, defendant, and capacity. All this out of (merely) ten counts in the complaint! Where the complaint was ambiguous on the capacity in which someone was sued, the court has assumed that the Plaintiffs intended to sue in both capacities. The list below is what the court takes the claims for relief in this case to be:

### Count I

An action, inferred by the Supreme Court, to redress violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, by the School Board.

### Count II

An action under 42 U.S.C. § 1983 to redress the failure to prevent and remedy
    (A) Daniel Acker, Jr.'s violation of the Fourteenth Amendment's Equal Protection Clause by
        (1) the School Board;
        (2) Lee Doebler in his official capacity as member of the School Board; and
        (3) Steve Martin, in his official capacity as member of the School Board; and
    (B) Daniel Acker, Jr.'s violation of the Fourteenth Amendment' s Due Process Clause by

23

(1) the School Board;
(2) Lee Doebler in his official capacity as member of the School Board; and
(3) Steve Martin, in his official capacity as member of the School Board.

## Count III

An action under 42 U.S.C. § 1983 to redress violation of the Fourteenth Amendment's Due Process and Equal Protection Clauses caused by
    (A) the failure to adequately train the subordinates of the
        (1) the School Board;
        (2) Lee Doebler in his official capacity as a member of the School Board; and
        (3) Steve Martin, in his official capacity as member of the School Board; and
    (B) the failure to adequately supervise the subordinates of the
        (1) the School Board;
        (2) Lee Doebler in his official capacity as a member of the School Board; and
        (3) Steve Martin, in his official capacity as member of the School Board.

## Count IV

An action under 42 U.S.C. § 1983 to redress the failure to prevent and remedy
    (A) Daniel Acker, Jr.'s violation of the Equal Protection Clause by
        (1) Lee Doebler, in his official capacity as a member of the School Board;
        (2) Steve Martin, in his official capacity as member of the School Board;
        (3) Lee Doebler, in his individual capacity; and
        (4) Steve Martin, in his individual capacity; and
    (B) Daniel Acker, Jr.'s violation of the Due Process Clause by
        (1) Lee Doebler, in his official capacity as a member of the School Board;
        (2) Steve Martin, in his official capacity as member of the School Board;
        (3) Lee Doebler, in his individual capacity; and
        (4) Steve Martin, in his individual capacity.

24

**Count V**

An action under Alabama law to redress an invasion of privacy by

(1) the School Board;

(2) Lee Doebler, in his official capacity as a member of the School Board;

(3) Steve Martin, in his official capacity as member of the School Board;

(4) Lee Doebler, in his individual capacity; and

(5) Steve Martin, in his individual capacity.

**Count VI**

An action under Alabama law to redress assaults and batteries by

(1) the School Board;

(2) Lee Doebler, in his official capacity as a member of the School Board;

(3) Steve Martin, in his official capacity as a member of the School Board;

(4) Lee Doebler, in his individual capacity;

(5) Steve Martin, in his individual capacity; and

(6) Daniel Acker, Jr.

**Count VII**

An Action under Alabama law to redress outrageous conduct by

(1) the School Board;

(2) Lee Doebler in his official capacity as a member of the School Board;

(3) Lee Doebler, in his individual capacity; and

(4) Steve Martin, in his individual capacity.

**Count VIII**

An action under Alabama law for Negligent and/or Wanton and Malicious Training, Supervision, and Retention by the School Board.

**Count IX**

An action under Alabama law for false imprisonment by

(1) the School Board; and

(2) Daniel Acker, Jr.

**Count X**

An action under Alabama law for loss of consortium caused by

(1) the School Board;

(2) Lee Doebler, in his official capacity as a member of the School Board;

(3) Steve Martin, in his official capacity as a member of the School Board;
(4) Lee Doebler, in his individual capacity;
(5) Steve Martin, in his individual capacity; and
(6) Daniel Acker, Jr.

## Count XI

An action, inferred by the Supreme Court, by Kristin Hurt to redress violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, by the School Board's failure to prevent a student-on-student retaliatory hostile environment.

## Count XII

An action by Kristin Hurt under 42 U.S.C. § 1983 for a hostile environment in violation of the Fourteenth Amendment's Equal Protection Clause caused by
(1) the School Board;
(2) Lee Doebler, in his official capacity as a member of the School Board;
(3) Steve Martin, in his official capacity as a member of the School Board;
(4) Lee Doebler, in his individual capacity;
(5) Steve Martin, in his individual capacity; and
(6) Daniel Acker, Jr.

## ANALYSIS

This portion of the opinion begins with the standard for summary judgment and then addresses the claims that were abandoned, stipulated as dismissed, or redundant. Next comes the untimeliness of Hurt's claims. The discussion then proceeds to the section 1983 and Title IX claims against the Board, then to the section 1983 claims against Doebler and Martin, and finally to the state law claims against Doebler and Martin.

## I.   <u>Summary Judgment Standard</u>

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits—or by the depositions, answers to interrogatories, and admissions on file—it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor

of the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249 (internal citations omitted).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993) (citation omitted). First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116.  In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17 (citation omitted). When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citation

omitted). The second method a movant in this position may use to discharge its burden is to provide affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering evidence sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.   <u>Stipulated Dismissals, Abandoned Claims, and Redundant Claims</u>

As to Counts X(1)–(6), summary judgment will be granted because the parties have agreed that loss of consortium is a measure of damages and not a claim.[7]

Counts V(1)–(3), VI(1)–(3), VII(1)–(2), VIII, and IX(1) are Alabama law torts asserted against the School Board and Lee and/or Doebler in their official capacities. These claims are barred by the Alabama constitution. *See* ALA. CONST. art. I, § 14 ("[T]he State of Alabama shall never be made a defendant in any court of law or equity."); *Ex parte Bessemer Bd. of Educ.*, 68 So.3d 782, 789 (Ala. 2011) ("Local school boards are agencies of the State, not of the local governmental units they serve, and they are entitled to the same absolute immunity as other agencies of the State."). Although the Plaintiffs' complaint raised these claims, they have wisely abandoned them in their brief in opposition to summary judgment. (*See* doc. 84 at 52)

---

[7]   The parties disagree about whether the named Plaintiffs in this case are entitled to recover loss of consortium damages. This will be taken up with the jury instructions.

("Plaintiffs do not seek to maintain state law claims against the School Board or its members in their official capacities."). Summary judgment will be granted as to these claims.

Counts II-A(2)–(3) and II-B(2)–(3) are section 1983 claims against Lee and Doebler in their official capacities. These claims are redundant because they are effectively claims against the School Board, *see Cook v. Randolph Cty.*, 573 F.3d 1143, 1149 (11th Cir. 2009), which is also named as a defendant for these substantive claims. Counts IV-A(1)–(2) and IV-B(1)–(2) are also section 1983 claims against Lee and Doebler in their official capacities, which are in essence claims against the School Board. Summary judgment will be granted as to these redundant claims.

The parties agree that the School Board's and its members' actions did not cause Acker to molest Hurt. Causation is required for liability to attach under Title IX and section 1983. Accordingly, Summary Judgment will be granted as to Hurt's Counts I, II-A(1), II-B(1), IV-A(1), and IV-B(1).

Counts III-A(1)–(3) and III-B(1)–(3), the failure to train claims, were quite strong. When Defendants moved for summary judgment as to these claims, however, Plaintiffs did not respond. This is perhaps because there were so many grounds for relief buried under allegations and implications in the complaint that the failure to train claims were simply lost in the shuffle. But that is the risk of shotgun

pleading—like the weapon for which it is named, when deployed recklessly, such a pleading poses danger to both its user and its target. Summary judgment will be granted as to these claims.[8]

## III. **Hurt's Remaining Claims**

Defendants move for summary judgment on all of Hurt's counts because (they say) the claims are time barred. In particular, they argue that Counts I, II-A(1), II-B(1), IV-A(3)–(4), and IV-B(3)–(4) are subject to a two year statute of limitations, *see* ALA. CODE § 6-2-38(*l*), and that Counts V(4)–(5), VI(4)–(5), and VII(3)–(4) are subject to a six year statute of limitations. ALA. CODE § 6-2-34. Because Hurt's claims are based on events that occurred in 1988–89 and 1992, the last of Hurt's claims expired in 2007, after taking account of a tolling period that lasted until 1999 due to her infancy. *See* ALA. CODE § 6-2-8.

Hurt responds that this court should equitably toll the statute of limitations on her claims, although she only explicitly discusses the Title IX claim. She asserts that the Eleventh Circuit's now-vacated decision in *Villareal v. R.J. Reynolds Tobacco Co.*, 806 F.3d 1288 (11th Cir. 2015), *reh'g en banc granted*, No. 15-10602, 2016 WL

---

[8] Count II of the complaint also said the "School Board had a longstanding policy, practice or custom of failing to prevent and remedy sexual abuse, including lax investigation [of] . . . an employee or agent [that] has a dangerous sexual propensity toward students." (Doc. 58, ¶ 147). This appears to be redundant with the failure to prevent and remedy claims and not an independent claim for relief.

635800 (Feb. 10, 2016), provides the standard for equitable tolling on "civil rights claims," a term that neither the *Villareal* panel nor Hurt define.

The court's 56(f)(2) notice proposed summary judgment in favor of Defendants as to Hurt's section 1983 and Title IX claims on the ground that the School Board and Board members did not cause her to be molested by Acker, which appeared to be the only injury she alleged in her complaint. Defendants agreed. (*See* doc. 89 at 2–4). Hurt, for her part, agreed that the Board and its members did not cause her to be molested, but she asseverated that she <u>also</u> seeks to recover for the retaliatory hostile environment she experienced after complaining about Acker's touching. Although these claims are vaguely raised by the complaint, this theory appeared in Hurt's brief in opposition to summary judgment, and binding circuit precedent requires the consideration of retaliation claims at summary judgment that are implied, albeit not expressly asserted, in the complaint. *See White v. Beltram Edge Tool Supply*, 789 F.3d 1188, 1200 (11th Cir. 2015). Accordingly, the court has considered Hurt's retaliatory hostile environment claims below.

A.    <u>Hurt's Federal Claims</u>

Hurt's only remaining federal claims are Counts XI and XII. An overview of the typical rules of accrual and tolling is helpful to put *Villareal* in context. "Federal law determines when a federal civil rights claim accrues." *Rozar v. Mullis*, 85 F.3d

32

556, 561–62 (11th Cir. 1996) (citation omitted). Accrual, for purposes of the statute of limitations, occurs "when the plaintiff has a complete and present cause of action," which happens when she "can file suit and obtain relief." *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 201 (1997). For section 1983 (and presumably Title IX), a cause of action is complete "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Lavallee v. Listi*, 611 F.2d 1129, 1131 (5th Cir. 1980).[9]

In the standard telling, equitable tolling is available when the plaintiff shows "(1) that [she] has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in [her] way and prevented timely filing." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (citation and internal quotation marks omitted) (alteration added). The plaintiff bears the burden of showing entitlement to equitable tolling. *Jackson v. Astrue*, 506 F.3d 1349, 1353 (11th Cir. 2007). "Equitable tolling is an extraordinary remedy which should be extended only sparingly." *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004) (citation and internal quotation marks omitted). "[E]quitable tolling typically requires some affirmative misconduct, such as fraud, misinformation, or deliberate concealment." *Horsley v. Univ. of Ala.*, 564

---

[9] This is binding authority in this circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

F. App'x 1006, 1009 (11th Cir. 2014).

The *Villareal* panel held that "the limitations period [in ADEA cases] is equitably tolled until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." 806 F.3d at 1304 (quoting *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924 (5th Cir. 1975)).[10] This rule may extend to other employment discrimination cases as well. This holding suggests that tolling is the <u>norm</u> in employment discrimination cases, which (in those cases anyway) would eviscerate the canonical requirement that equitable tolling be applied as an "extraordinary remedy"—a point the panel conceded. *See* 806 F.3d at 1304 n. 13. Instead, the panel reasoned that it made "good sense" for the standard governing equitable tolling to be nontranssubstantive, because it is uniquely easy for employers to mask evidence of their discriminatory conduct. *Id.* Hurt would extend this rule (assuming its survival of *en banc* rehearing) to Title IX and section 1983.[11]

---

[10]  *Reeb* is binding authority in this circuit. *See* note 9, *supra*.

[11]  Hurt, in her "Notice Regarding Case Citation," doc. 86, reported to the court that *Villareal* was vacated and should not be relied upon. However, she also argues that the equitable tolling analysis should be unchanged by the vacatur. Considering the concession by the *Villareal* panel that the tolling rule therein is a departure from the hornbook rule in light of Hurt's assertion that the analysis is unchanged, the court takes her Notice to indicate that, while *Villareal* should not be relied upon as binding authority, it should be considered as persuasive authority (in both senses of the phrase).

However potent the rule in *Villareal*, it is inapplicable here. Where a federal court looks to state law to supply a statute of limitations, "provisions regarding tolling, revival, and questions of application" are bundled with the statute of limitations and should only be disregarded when "their full application would defeat the goals of the federal statute." *Hardin v. Straub*, 490 U.S. 536, 539 (1989); *Rubin v. O'Koren*, 644 F.2d 1023, 1025 (5th Cir. Unit B May 1981).[12] The bundle includes also the state's principles of <u>equitable</u> tolling, so long as they do not frustrate the federal substantive right. *See King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 764 (5th Cir. 2015) (applying Texas equitable tolling principles to claims under Title IX and section 1983); *Montin v. Estate of Johnson,* 636 F.3d 409, 413 (8th Cir. 2011); *Garrett v. Fleming*, 362 F.3d 692, 697 (10th Cir. 2004); *Jones v. Blanas*, 393 F.3d 918, 928 (9th Cir. 2004). *But see Ashafa v. City of Chicago*, 146 F.3d 459, 463–64 (7th Cir. 1998) (pondering whether state equitable tolling "operate[s] exclusive of or in conjunction with the federal doctrine")

Both Title IX and section 1983 actions filed in this district are governed by Alabama's personal injury statute of limitations, ALA. CODE § 6-2-38(*l*). *Lufkin v. McCallum*, 956 F.2d 1104, 1105 n.2 (11th Cir. 1993); *Beasley v. Ala. State Univ.*, 966 F. Supp. 1117, 1127–28 (M.D. Ala. 1997) (Title IX); *cf. M.H.D. v. Westminster Sch.*,

---

[12] This is also binding authority in this circuit. *See* note 9, *supra*.

172 F.3d 797, 803 (Title IX references forum state's limitations period), so Alabama's standard for equitable tolling applies as well. *Neeley v. Walker*, 67 F. Supp. 3d 1319, 1326 n. 4 (M.D. Ala. 2014). In contrast, the ADEA, Title VII, and the ADA have their very own federal statutes of limitations, obviating the need for a reference to state law. In accordance with the bundling rule, <u>federal</u> equity principles govern the equitable tolling of those statutes, but federal equity only governs Title IX and section 1983 as a backstop against state equity's potential undermining of federal policies. *Cf. M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 224 (2d Cir. 2003) (noting the obligation to apply Connecticut equity principles in an IDEA case, but declining to do so because of state conflict with federal policy).

Turning now to Alabama's equity principles, "'a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstances stood in [her] way as to the filing of [her] action.'" *Ex parte CVS Pharmacy, L.L.C.*, __ So.3d __ (Ala. May 27, 2016) (slip op. at 11) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)) (alteration removed). The astute reader will notice that Alabama uses the hornbook formulation. There is no "discovery rule"—a principle tolling the running of the limitations period until the misconduct is discovered—that is applicable to section 6-2-38(*l*). *Util. Bd. of City of Opp. v. Shuler Bros, Inc.*, 138 So.3d 287,

292–93 (Ala. 2013).

Before proceeding to the application of these principles, a word on why the Alabama standard does not undermine the policy of section 1983 and Title IX. First, the Eleventh Circuit has applied the canonical formulation of equitable tolling in section 1983 and *Bivens*[13] cases. *See, e.g.*, *Moore v. Chamberlain*, 559 F. App'x 969, 970 (11th Cir. 2014) (Mem) (applying federal equity and Florida equity, both vanilla, to section 1983 claims); *Moore v. Fed. Bureau of Prisons*, 553 F. App'x 888, 889 (11th Cir. 2014) (*Bivens*). The Court of Appeals would not apply a state tolling rule to section 1983 if that state rule's application would frustrate the substantive rights the federal statute protects. Second, *Villareal* itself emphasized that "courts must take special care when considering the timeliness of <u>employment discrimination</u> claims," 803 F.3d at 1304 (emphasis added), so to the extent it is Hurt's position that the federal policies surrounding all "civil rights" statutes require a more forgiving doctrine of equitable tolling à la *Villareal*, the panel's opinion is to the contrary.

Back to the Alabama standard. The gist of Hurt's argument in favor of tolling is that she did not know until Doebler's deposition in <u>this</u> lawsuit of the possibility

---

[13] "[T]he federal analog to suits brought against state officials . . . under 42 U.S.C. § 1983," *Hartman v. Moore*, 547 U.S. 250, 254 n. 2 (2006), a *Bivens* claim for damages to remedy the violation of constitutional rights was first announced in the eponymous *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

that the Board members had been deliberately indifferent in the non-firing of Acker. This will not do. Firs, her argument assumes that the claim should be tolled until Doebler was deposed in 2015, even though she filed this lawsuit in 2013. If the discovery process was the key to gaining the information that she needed to sue in the first place, why did she file a lawsuit in 2013? If she was willing and able to file an action without the supposedly necessary information, she could have filed within the limitations period, but she did not. She therefore has not diligently pursued her rights, nor is she entitled to the application of the discovery rule, which is categorically inapplicable to this limitations period. Further, there was no extraordinary circumstance standing in her way; she was subjected to a hostile environment and observed that it was not being remedied as far back as 1992. She was therefore cognizant of her injury. It was not the Board that kept her from filing; "[i]t was [Hurt's] own dilatoriness." *Wayne v. Jarvis*, 197 F.3d 1098, 1104 (11th Cir. 1999), *overruled on other grounds*, *Manders v. Lee*, 335 F.3d 1304 (11th Cir. 2003). She is not entitled to equitable tolling of her federal claims.

### B.   Hurt's State Law Claims

Unsurprisingly, Hurt's Alabama claims are also subject to Alabama equitable principles. *Cf. Hartford Cas. Ins. Co. v. Jenkins*, No. 09-0514-WS-M, 2010 WL 238619, at *4 n. 4 (S.D. Ala. June 9, 2010) ("Alabama law of laches controls.").

These claims will also (still no surprises!) not be equitably tolled. The reasoning for the federal claims applies *a fortiori* here, because the state law claims (invasion of privacy; outrage; assault and battery; negligent training, supervision, or retention; and false imprisonment) could have been maintained based on knowledge that Hurt had in 1991—that Acker had molested her. Additionally, she only argues the timeliness of her <u>Title IX</u> claims in her brief before requesting equitable tolling for <u>all</u> claims. An argument is waived "if the party fails to elaborate or provide any citation of authority in support of the argument." *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n. 13 (11th Cir. 2007) (citation and internal quotation marks omitted). Summary judgment will be granted in favor of Defendants of all of Hurt's claims.

## III.   <u>Section 1983 and Title IX against the School Board</u>

### A.   <u>Title IX</u>

Title IX, with certain exceptions irrelevant here, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has inferred a private right of action in Title IX. *Cannon v. Univ. of Chicago*, 411 U.S. 677, 688–89 (1979). A teacher's sexual harassment of a student is actionable under Title IX, and the student may recover damages from the covered

entity. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). To prevail in a teacher-on-student harassment claim,[14] the plaintiff must prove that 1) "a person with the authority to take corrective measures in response to actual notice of sexual harassment"—call that an "appropriate person"—had 2) notice that was "sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment," yet 3) the official responded with "deliberate indifference to the harassment." *J.F.K. v. Troup Cty. Sch. Dist.*, 678 F.3d 1254, 1255–56 (11th Cir. 2012).

A curious feature of this circuit's Title IX jurisprudence is that notice and, for lack of a better word, the <u>materiality</u> of the notice are merged in a single element of the claim. The discussion in *Doe v. Sch. Bd. of Broward Cty.* highlights this quirkiness: "Even if prior complaints by other students are not clearly credible, at some point a supervisory official <u>knows</u> . . . that a school official <u>is a substantial risk</u> to sexually abuse children." 604 F.3d 1248, 1259 (11th Cir. 2010) (emphasis added). This passage clearly contemplates a distinction between the receipt of literal notice and, so to say, notice-worthy-of-belief.[15] Only the latter of these is sufficient to create

---

[14]  A plaintiff is also required to prove that the defendant operates an educational program that is a federal funding recipient. 20 U.S.C. § 1681(a). The parties have not addressed this issue, but they apparently (and reasonably) assume the Board is such an entity. At trial, unless this fact is established by stipulation, the Plaintiffs will be required to introduce evidence establishing this fact.

[15]  By way of (loose) comparison, an action under the Securities Exchange Act's Rule 10b-5, in its boilerplate formulation, also merges materiality with the statement in issue. *See,*

liability. The distinction between material notice as a single element or as <u>two</u> distinct elements is perhaps metaphysical (both get to the same destination), but the phrasing is confusing; one need only examine the parties' positions to see that.

Defendants move for summary judgment as to the Title IX claim on two grounds: first, that an appropriate person lacked actual notice of Acker's conduct as to the Jane Does, and second, that the Board did not act with deliberate indifference because they fired Acker as soon as he was arrested, and the 1993 decision not to fire him was the wrong choice but not the product of willful blindness. Plaintiffs respond to the notice argument by saying that the Board was well aware of Hurt's complaint, which Plaintiffs argue provided sufficient notice to the Board of the risk that Acker would molest the Jane Does. The Defendants, in reply, argue first that the Board's conclusion "that Acker had not engaged in the misconduct [alleged in 1992] does not establish actual knowledge."(Doc 89 at 3). And second, that the breadth of evidence considered—especially the evidence that cut against Acker's termination—precludes a finding of deliberate indifference. The issue of notice will be considered *tout de suite*, but the discussion of deliberate indifference, which is also relevant to section

---

*e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) ("(1) a material misrepresentation . . ."). But it is quite clear, at least in this circuit, that materiality is a distinct element of the claim. *See S.E.C. v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012) (assuming the existence of a misrepresentation but examining the "'materiality' element").

1983, will be briefly postponed.

A comparison of the parties' positions on notice reveals the rub in a conception of "notice" that also contains materiality: Plaintiffs argue from the word's literal meaning, and Defendants argue "notice," the Title IX term of art. A necessary premise of the Defendants' argument is that, where a credibility dispute is resolved against a Title IX complainant, that complaint does not supply material "notice" within the meaning of this circuit's decisional law. But the *Broward* panel foreclosed this line of argument by stating that it did "not find it determinative of the School Board's liability that the results of the [prior] investigations were ultimately inconclusive." 604 F.3d at 1259. Additionally, the Eleventh Circuit has contemplated in dictum that a single sufficiently similar complaint can constitute notice. *Troup*, 678 F.3d at 1260 (finding a lack of notice where an appropriate person "was never put on notice of any single act . . . of actual sexual harassment"). Hurt's allegations are sufficient to allow a jury to find that the School Board had actual notice of the substantial risk of sexual harassment.

B.    Section 1983

42 U.S.C. § 1983 provides an avenue of legal and equitable redress to "every person who" is subjected to "the deprivation" under color of state law "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

"Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion) (citation and internal quotation marks omitted). Title IX is not enforceable against an individual via section 1983. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1300 (11th Cir. 2007).

"[A] municipality may not be held liable under [section] 1983 solely because it employs a tortfeasor," *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997), so it cannot be held liable under a theory of *respondeat superior*. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Rather, to impose liability on a municipality (or school board), a plaintiff must identify a "policy" or "custom" that caused the plaintiff's injury. *Monell v. Dep't of Social Serv. of the City of New York*, 436 U.S. 658, 694 (1978). The policy or custom must evince the "requisite degree of culpability." *Davis v. DeKalb Cty. Sch. Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. . . . A custom is a practice that is so settled and permanent that it takes on the force of law." *Cooper v. Dillon*, 403 F.3d 1208, 1211 (11th Cir. 2005) (citation omitted). "Whether a particular official has final policymaking authority is a question of state law." *McMillian v. Monroe Cty.*, 520 U.S. 781, 786 (1997).

43

The state of mind required to impose municipal liability for the failure to prevent and (presumably) remedy constitutional violations does not depend on the state of mind required to establish the underlying violation. *Brown*, 520 U.S. at 397 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 n. 8 (1989)). The culpable mental state in a failure-to-prevent claim will always be deliberate indifference. *Davis*, 233 F.3d at 1376. Thus, the Plaintiffs must show that the Board 1) had a custom or policy, 2) which was deliberately indifferent to the risk of child molestation, 3) that caused Plaintiffs to be molested. *Cf. Am. Fed. of Labor and Cong. of Indus. Organizations v. City of Miami*, 637 F.3d 1178, 1187 (11th Cir. 2011) (describing the framework for municipal liability for First Amendment violations).[16] As with Title IX, deliberate indifference will be taken up later, but the other elements will be dealt with presently.

No one disputes that the Plaintiffs were molested by Acker, which surely violated their rights under the Fourteenth Amendment's Equal Protection and Due Process Clauses. Plaintiffs do not try to argue that there was a custom of deliberate indifference to child molestation (it would be a chimerical statement), but they argue that the decision not to fire Acker was a "policy," in reliance on the settled rule that

---

[16] *City of Miami* makes clear that the requirements for municipal liability are 1) A custom or policy, 2) that caused, 3) a constitutional injury. When the policy is facially constitutional, the custom or policy must be "deliberately indifferent" to the risk of constitutional injury. *See* 637 F.3d at 1187.

"municipal liability may be imposed for a single decision by municipal policymakers." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Defendants only tepidly dispute the characterization of the decision as a policy. A jury could find a decision by the Board not to fire a teacher is a policy, because the Board is the only body vested with the authority to do so. ALA. CODE § 16-8-23; *cf. Owen v. City of Independence*, 445 U.S. 622 (1980) (finding a policy where city council unanimously voted to terminate chief of police without a hearing). Notably, however, the Plaintiffs do not allege any custom or policy of <u>failing to monitor</u> Acker after he was returned to the classroom, so this theory of deliberate indifference (as discussed later) is unavailable to support a section 1983 claim. Finally, a reasonable jury could find that the decision not to terminate Acker was a "but-for" cause of the Jane Does' molestations.

C.   <u>Deliberate Indifference</u>

With that rococo[17] regime in mind, the court turns now to deliberate indifference. Under Title IX, a school board is deliberately indifferent when "their response to the harassment . . . is clearly unreasonable in light of the known circumstances" effectively resulting in "an official decision not to remedy the

---

[17] *Cf. Bryan Cty.*, 520 U.S. at 433 (Breyer, J., dissenting) (The "basic effort to distinguish between vicarious liability and liability derived from 'policy or custom' has produced a body of law that is neither readily understandable nor easy to apply.")

violation." *Broward*, 604 F.3d at 1259. As to section 1983,[18] Congress did not intend to impose liability on a municipality in the absence of "a conscious disregard for a high risk . . . [of] violation of [the plaintiffs'] federally protected right[s]." *Brown*, 520 U.S. at 415–16. Thus, deliberate indifference will "ordinarily" only be found in the face of "[a] pattern of similar constitutional violations." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Alternatively—at least in the failure to train context—a particular harm could be so obviously inherent to the governmental enterprise at hand that the failure to protect against it manifests deliberate indifference. *Id.* at 63. The latter is rare, perhaps vanishingly so.

The first (of Plaintiffs' three) allegedly deliberately indifferent acts is the failure to fire Acker in the face of the DHR report. The viability of this theory depends upon the specific findings that a jury makes. If a jury determined that the Board declined to fire Acker after the Board determined that Hurt was not credible, the Board's action would not constitute deliberate indifference as a matter of law. Plaintiffs appear[19] to have conceded as much when they argued that Hurt could only

---

[18]  It is likely that "deliberate indifference" for purposes of section 1983's municipal liability and Title IX's teacher-on-student cause of action have the same content. But, they are formulated somewhat differently, so there is no harm in reciting both.

[19]  "Taking the facts in the light most favorable to the plaintiff,, [sic] Kristin Hurt did not know until Defendant Doebler's deposition that Superintendent Rogers had been deliberately indifferent in concealing DHR Administrative Hearing Officer Loper's final report from the school board . . ." (Doc. 84 at 42).

have known of the Board's alleged deliberate indifference after Doebler's 2015 deposition in which he claimed not to have seen the DHR report. This (no doubt inadvertent) admission aside, merely reaching the wrong conclusion is, as a general matter, insufficient to constitute deliberate indifference. *Davis*, 233 F.3d at 1375.

It is, of course, conceivable that a single report or incident could be so compelling that its disregard would constitute deliberate indifference. But that is not this case. Here, the jury could find that the Board viewed the DHR report, found it to be incredible, and so, in light of the character witnesses, the grand jury's failure to indict, and the fact that Acker was allowed (at one time, at least) to visit the Lopez children, they voted not to terminate Acker. On these facts, a credibility determination adverse to Hurt <u>cannot</u> constitute deliberate indifference.

But the jury could make an alternative set of findings that would allow them to conclude that Doebler and Martin had been deliberately indifferent in failing to fire Acker. In particular, the jury could find that Rogers did present the report <u>and</u> could believe Martin's statement that he believed the contents of the report warranted firing. Thus, the jury could infer that Martin and Doebler saw the report, reached the conclusion that its contents justified Acker's termination; *i.e.*, Doebler and Martin believed that Acker had molested Hurt, yet they voted not to terminate Acker. These findings would permit a jury conclusion that Doebler and Martin had disregarded a

47

substantial risk of sexual harassment. While relatively narrow, this factual circumstance is textbook deliberate indifference. *Cf. Hope v. Pelzer*, 536 U.S. 730, 763 (2002) ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

The only problem with this theory is that Doebler and Martin, while members of the School Board, were not a majority of the School Board. Thus, even if the jury concluded that Doebler and Martin thought Acker should be terminated (which may be a stretch as to Doebler, who only questioned, but did not repudiate, his decision when shown the report), yet voted to reinstate him, they are only two votes. Three votes were required for the Board to take any action, so whatever a reasonable jury could find about Doebler's and Martin's beliefs in reinstating Acker, those beliefs did not cause Acker to be reinstated. This theory of deliberate indifference is infirm.

For their second proposed deliberately indifferent act, Plaintiffs argue that if the jury found that Rogers failed to turn over the DHR report, such a finding would allow the jury to conclude that the School Board was deliberately indifferent. The "swearing match," doc. 84 at 6, between Rogers and the Board members certainly creates a factual dispute that is material to whether the Board members were deliberately indifferent, but even if the jury found that Rogers failed to turn over the

report, her actions were negligent at worst, not "clearly unreasonable in light of the known circumstances." *Broward*, 604 F.3d at 1259.

There appear to be two ways in which the court could read Plaintiffs' theory as to how Rogers's withholding of the report could constitute deliberate indifference. On the most natural reading, the Plaintiffs' argument is that because Doebler and Martin assessed the report as persuasive in 2015, Rogers's submission of the report would have forced the Board to reach the correct result. But because the wrong result was reached, Rogers's failure to include the report was a deliberately indifferent act. The mere failure to reach the correct result, once again, is generally insufficient to establish deliberate indifference. *Davis*, 233 F.3d at 1375.

An alternative reading of their theory is that the failure to include a particular piece of evidence—the report—substantially increased the likelihood of sexual assault because it substantially increased the risk of an erroneous determination of Acker's guilt. Call this a theory of deliberately indifferent process, and there is (like the earlier blatantly-wrong-determination theory) something to it; a school board would be in deep trouble if it resolved sexual harassment allegations by flipping a coin. *Cf. Broward*, 604 F.3d at 1261 (criticizing an investigator's failure to consult witnesses to an alleged sexual assault). But these facts do not present so defective a procedure.

No reasonable jury could find that Rogers's decision to present live testimony from Hurt, Acker, Hurt's psychiatrist, Hurt's mother, a DHR representative, and a police officer created a substantial risk of an erroneous determination of Acker's guilt in comparison to the inclusion of the report. Indeed, given the axiomatic preference, *see McDowell v. Blankenship*, 759 F.3d 847, 852 (8th Cir. 2014), in the courts for live testimony, a better case could be made for deliberate indifference if Rogers had dispensed with the live testimony and instead just relied on the report.

That Doebler and Martin have suggested a different outcome had the report been presented does not undermine the conclusion that the evidence considered was sufficient to satisfy Title IX and 1983. An *ex post* assignment of dispositive weight to a particular piece of evidence does not render the decision to consider other, substantively similar, evidence "clearly unreasonable in light of the known circumstances." *Davis*, 233 F.3d at 1371. "[T]he known circumstances" bears emphasis: the deliberate indifference inquiry is assessed from the point of view of what Rogers knew or should have known, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999), at the time she decided which evidence to present—not the Board members' retrospective commentary on the persuasiveness of a single piece of evidence twenty-two years after the fact. *Cf. Farmer, v. Brennan*, 511 U.S. 825, 845 (1994) (deliberate indifference assessed in light of current attitudes and conduct).

Plaintiffs' third theory of deliberate indifference is based on the Eleventh Circuit's position that a Title IX entity's "duty to deter," *Broward*, 604 F.3d at 1258, sexual harassment can compel "an affirmative undertaking," *Gebser*, 524 U.S. at 297, to "ferret[] out" the possibility of such harassment in the face of repeated complaints about a teacher. *Broward*, 604 F.3d at 1261. In short, where there is smoke, a school has the duty to look for fire. Defendants' only response to this to this theory is that there is no duty to monitor when the first complaint is disbelieved.

It has always[20] been the case that "corrective action such as monitoring and admonishing an accused teacher" in response to an inconclusive investigation of harassment is not deliberate indifference as a matter of law. *Id.* at 1262; *see Davis*, 233 F.3d at 1374–75. In *Broward*, the Eleventh Circuit expanded and refined this principle somewhat so that a school board's <u>failure</u> to monitor or admonish in response to a series of inconclusive investigations could create a jury question on deliberate indifference. The Plaintiffs argue that *Broward* compels monitoring after <u>any</u> inconclusive investigation, but the opinion says no such thing:

> . . . Here, once it was a known circumstance that Hoever <u>had been accused of multiple acts of sexual harassment</u> in his classroom behind closed doors, such cautionary measures could have contributed to the reasonableness of

---

[20]   As long as Title IX has been available as a conduit to remedy teacher-on-student sexual harassment, anyway.

> the School Board's response.
>
> . . . [W]e conclude that Doe has adduced sufficient evidence to create a genuine issue of material fact as to whether Scavella's response to the <u>cumulative complaints of K.F. and S.W.</u> was clearly unreasonable in light of the known circumstances.

*Broward*, 604 F.3d at 1262 (emphasis added). The foregoing makes clear that *Broward* is only controlling where there are several plumes of smoke and an undiscovered fire, yet the school makes no serious search effort. *Broward* is therefore analogous to *Connick v. Thompson's* "ordinary[]" case for deliberate indifference: a repeated pattern of violation of federal rights. *Cf.* 563 U.S. at 62.

That this case is not controlled by *Broward* does not mean *Broward* prescribes the sole scenario in which there is a duty to inquire. Plaintiffs also appear to argue that a duty to monitor is triggered when an investigation determines that the teacher did not harass a student, but the determination is a close call. There is nothing in *Broward* or subsequent published opinions that forecloses this, and Plaintiffs rely on then-District Judge Jordan's concurring opinion in *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, in which he suggested that where a school has actual notice of a coach's sexual harassment at previous institutions, the school would be deliberately indifferent to the risk of harassment if it did not monitor the coach after hiring him. 477 F.3d at 1305. But Judge Jordan's opinion <u>does not</u> support the Plaintiff's

argument; their reliance is misplaced. His reasoning largely tracked the panel's, except *Williams's* panel opinion was about student-on-student harassment. *Id.* at 1298–99.

Yet, the court is satisfied that *Williams* is relevant to this case. If confirmation of a student's past egregious sexual misconduct is sufficient to create a duty to monitor, then confirmation of a teacher's highly inappropriate, but not egregious, sexual misconduct would also create a duty to monitor under Title IX. A difference in severity of conduct is appropriate considering the relatively lighter burden of proving a Title IX violation for teacher-on-student compared to student-on-student harassment. *See Hill v. Cundiff*, 797 F.3d 948, 968–69 (11th Cir. 2015). The reader will recall that the Plaintiffs have not identified a custom or policy of failing to monitor Acker, so only the Title IX claim would be viable under this theory.

Thus, a reasonable jury could determine that the failure to monitor, or even say anything, to Acker after the termination hearing constituted deliberate indifference to the risk of child molestation. Among others, the following findings by the jury would support such conclusion: that a majority of Board members believed that Acker had written a note to Hurt about her panties—a comment that was highly inappropriate—confirming past sexual misconduct; that the School Board's members believed supervising Acker was necessary yet failed to effectuate that supervision;

and that, in light of evidence that Acker penetrated Jane Doe #3's vagina while in a classroom full of students, even cursory supervision would have thwarted Acker's rampage. In short, the jury could conclude that, upon Acker's return, the Board "refuse[d] to take action to" ensure "compliance" with Title IX. *Gebser*, 524 U.S. 290. Summary judgment will be denied as to Count I and granted as to Counts II-A(1) and II-B(1).

IV.    <u>**Section 1983 against Doebler and Martin, Individually**</u>

Doebler and Martin move for summary judgment on the section 1983 claims brought against them individually on the ground that they are entitled to qualified immunity. To successfully invoke this defense, they bear the burden of showing that they were engaged in a discretionary function. Once such a showing is made, the burden shifts to the Plaintiffs to show that  "(1) the defendant[s] violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Hill*, 797 F.3d at 978 (11th Cir. 2015). "The time of the violation" is the time of the action alleged to have inflicted constitutional injury. *See Siegert v. Gilley*, 550 U.S. 226, 231 (1991).  There are three ways that a right may be clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious

54

that a constitutional right was clearly violated, even in the total absence of case law." *Hill*, 797 F.3d at 979 (citation omitted). Thus, "the salient question . . . is whether the state of the law in 199[3] gave [Martin and Doebler] fair warning" that their conduct was unconstitutional. *Hope*, 536 U.S. at 741.

As before, the plaintiffs urge that the source of the constitutional injury is Doebler's and Martin's votes in the 1993 termination hearing. Defendants claim, and Plaintiffs do not dispute (they could not if they wanted to) that the firing decision was a discretionary act. Also as before, the facts could be interpreted to allow the jury to find that Doebler and Martin violated the plaintiffs' constitutional rights by reaching this decision.[21] However, the Plaintiffs make no effort to argue that "the state of the law in 199[3]" provided "fair warning" to Doebler and Martin about the illegality of their conduct. Instead, Plaintiffs cite a 2015 case for the proposition that "an official . . . would not have believed doing nothing was lawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation." *Hill*, 797 F.3d at 979. Without Eleventh Circuit or Supreme Court authority clearly establishing the unconstitutionality of their conduct prior to

---

[21]   Plaintiffs do not argue that Doebler and Martin themselves were deliberately indifferent in failing to monitor Acker. They would be entitled to qualified immunity on this claim anyway, since a concurring judge's hypothesis establishes law as clearly as the latest volume of a law review, which is to say, not at all.

1993,[22] the plaintiffs cannot meet their burden. Summary judgment will be granted in favor of Doebler and Martin.

## V.   Alabama Claims against Doebler and Martin, Individually

The still-living Alabama claims, brought within this court's supplemental jurisdiction by 28 U.S.C. § 1367, are invasion of privacy (Counts V(4)–(5)), assault and battery (Counts VI(4)–(5)), and outrage (Counts VII(3)–(4)). The claims are asserted against Doebler and Martin in their individual capacities, again alleging that the tortious act is to be found in the 1993 termination hearing. Defendants' argument in favor of summary judgment is that they are immune from suit under Alabama's doctrine of discretionary function immunity for state agents, which should not be confused with the absolute immunity afforded to the State of Alabama. *See generally Ex parte Cranman*, 792 So.2d 392, 396–406 (Ala. 2000) (plurality opinion). Plaintiffs do not dispute that the decision was discretionary; they do argue it falls within the

---

[22] *Hill* cites a 1995 case, *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1503 (11th Cir. 1995). While *Hill* does not discuss *Cross* at length, the *Cross* panel held that "a reasonable person . . . could not have believed doing nothing ['in response to knowledge of a subordinate director's sexual harassment'] was lawful, in light of the clearly established law that sexual harassment and discrimination was an infringement of legal rights." *Id.* It is the Plaintiffs' task to trace *Cross's* lineage to establish the unconstitutionality of the defendants' actions in 1993, and the court declines to do it for them. A judge cannot "call balls and strikes" if she is also expected "to pitch [and] bat." *See Roberts: 'My job is to call balls and strikes and not to pitch or bat,'* CNN (Sept. 12, 2005, 4:58 PM), http://www.cnn.com/2005/POLITICS/09/12/roberts.statement.

exceptions to Alabama's state-agent immunity.[23] The Defendants once again have the better argument.

*Ex parte Cranman*, a plurality opinion, supplies the standard for state-agent discretionary function immunity. *Brown v. City of Hunstville*, 608 F.3d 724, 741 n. 26 (11th Cir. 2010) (noting that a majority of the Alabama Supreme Court later adopted *Cranman*). "A [s]tate agent shall be immune from civil liability in his or her personal capacity [for] . . . . exercising his judgment in . . . . hiring, firing, transferring, assigning, or supervising personnel," unless the agent acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Cranman*, 792 So.2d at 405. "The Alabama Supreme Court established a burden-shifting framework for application of the state-agent immunity test." *Grider v. City of Auburn*, 618 F.3d 1240, 1255 (11th Cir. 2010). The agent seeking the cloak of immunity bears the burden of showing that "the

---

[23] It appears that the Plaintiffs' only basis for assigning liability to Martin and Doebler for these state law torts is *respondeat superior*. A pre-*Cranman* case noted that "[a] claim of respondeat superior does not fit into any of the[] special exceptions to the absolute immunity afforded to state officials when the action is, in essence, one against the state." *White v. Birchfield*, 582 So.2d 1085, 1088 (Ala. 1991) (non-italicized in original). *White* considered a sheriff's liability under *respondeat superior* for the acts of his jailer and concluded that the sheriff "is an officer of the state and the hiring of the jailer is one of his official duties. Thus, he is immune from suit under Art. I, § 14, Alabama Constitution." *Id. White* would appear to control here, if it survived *Cranman*. *See also Seay v. Cleveland*, 508 S.E.2d 159, 161 n. 1 (Ga. 1998) ([W]e reiterate [that] a sheriff . . . can only be sued in his official capacity under respondeat superior.") (non-italicized in original).

plaintiff's claims arise from a function that would entitle the State agent to immunity." *Ex parte Estate of Reynolds*, 946 So.2d 450, 452 (Ala. 2006). If he "makes such a showing, the burden then shifts to the plaintiff to show that the [s]tate agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id.*

"Not every innocent misinterpretation of the law revokes an official's state-agent immunity under Alabama law." *Hill*, 797 F.3d at 981.[24] "[T]he misinterpretation of the law must be coupled with willfulness, maliciousness, or bad faith to 'pull the agent out from under the umbrella of state-agent immunity.'" *Id.* at 982 (quoting *Segrest v. Lewis*, 907 So.2d 452,456 (Ala. Civ. App. 2005)). "Bad faith . . . requires more than a showing of incompetence. Bad faith 'is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty . . . through some motive of self-interest or ill will.'" *Hill*, 797 F.3d at 980 (quoting *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So.2d 916, 924 (Ala. 1981)).

Conceding the discretionary nature of the firing decision, Plaintiffs argue that the decision not to terminate Acker was effectuated under a mistaken interpretation

---

[24]   The Eleventh Circuit's formulation of and *Erie* guesses on Alabama law bind this court "unless and until it is overruled by intervening on-point case law from our circuit sitting *en banc*, the Supreme Court, or, on matters of [Alabama] state law, the [Alabama] Supreme Court." *Palmer & Cay, Inc. v. Marsh & McLennan Co., Inc.*, 404 F.3d 1297, 1308 n. 15 (11th Cir. 2005).

of the law, and the decision to reinstate him was willful, malicious, or in bad faith. The alluded-to mistakes of law are 1) that Doebler believed that Acker could not be terminated unless it was shown "beyond any doubt," that Acker had molested Hurt; 2) Doebler's decision to allow a boy to testify that the boy had been intimate with Hurt, for the purpose of besmirching Hurt's character; and 3) Doebler's ignorance of the age of consent in Alabama, which Plaintiffs describe as his "not think[ing] there was anything illegal about a sixteen year old having sexual conduct with a girl under twelve." (Doc. 84 at 54).

Plaintiffs also suggest that, because of the credibility dispute vis-à-vis the presentation of the DHR report to the Board, a reasonable jury could conclude that Doebler and Martin are now lying, so their actions in 1993 were taken in bad faith and were fraudulent and malicious. (Doc. 84 at 54). The court assumes that this is being advanced as a separate ground for piercing the veil of discretionary-function immunity.

A sensible way of analyzing the "mistaken interpretation of the law" exception is to ask whether the so-called mistake was in fact a relevant misapprehension of the law, and only then proceeding to consider whether it was done in bad faith. Working backward, Doebler's deposition reflects that he was and is ignorant of the fact that a sixteen year old having sexual contact with a twelve year old would constitute a crime

in Alabama. *See* ALA. CODE § 13A-6-62(a)(1). This ignorance is perhaps derelict, but the Plaintiffs have not argued that it was relevant to the decision not to fire Acker except by *ipse dixit*. A state agent's freestanding misapprehension or ignorance of a law does not allow open season on that agent.

As for the salacious testimony from Hurt's alleged paramour, Plaintiffs have cited no law that the Board contravened by allowing it. Federal Rule of Evidence 412 does not apply in Alabama proceedings, and Alabama did not adopt its version of the rule, which only applies in criminal proceedings, until 1996. *See* ALA. R. EVID. 412 editor's note. An analogous predecessor statute also only applied to criminal cases. *See* ALA. CODE § 12-21-203. Moreover, the rules of evidence are usually inapplicable in administrative proceedings. The decision to allow the irrelevant testimony, while crass, was not illegal.

On to the third mistake. The Defendants appear to concede Doebler's misapprehension of the standard of proof was an error of law. Because this error must be accompanied by maliciousness, taken in bad faith, or have been fraudulent, the critical question is whether there is sufficient evidence for the jury to find that the decision to reinstate Acker was one of those things. There is not. Plaintiffs' argument is that a jury could conclude that Doebler and Martin are now lying about having seen the DHR report, so the jury could infer that they acted in bad faith, fraudulently, or

maliciously in 1993. But the Jane Does have pointed out no evidence demonstrating "ill will," as opposed to (in the light most favorable to the Plaintiffs) dunderheaded deliberate indifference.[25] Summary judgment will be granted in favor of Doebler and Martin as to the state law clams.

## CONCLUSION

The court **GRANTS** summary judgment on Hurt's Counts I, II-A, and II-B in favor of defendants *sua sponte*. It is **ORDERED** that the School Board's motion for summary judgment is **GRANTED** as to all of Kristin Hurt's other claims. As to all other plaintiffs, it is **ORDERED** that the School Board's motion for summary judgment is **DENIED** as to Count I, the Title IX claim. The court **GRANTS** summary judgment as to Counts X(1)–(6) *sua sponte*. As to all other claims, the School Board's motion for summary judgment is **GRANTED**.

Additionally, the theories of deliberate indifference are limited as set out herein.

---

[25] While "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), the court clarifies that the sundry descriptions of Dan Acker, Sr.'s relationship to and interaction with the Board and its superintendent provide no evidence that Rogers and the Board intentionally abdicated their duties. There is no evidence that the Board members or Rogers were possessed of wicked hearts or wicked minds.

**DONE** this 27th day of July, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge